**In re NEW YORK CITY MUNICIPAL SECURITIES LITIGATION.**

**MDL 314.**

United States District Court,
S. D. New York.

Jan. 25, 1980.

Pomerantz, Levy, Haudek & Block, New York City by Richard M. Meyer, Eugene H. Zagat, Jr., William E. Haudek, New York City, for Friedlandler class plaintiffs.

Gold, Farrell & Marks by Thomas R. Farrell, New York City, for Spector class plaintiffs.

William M. Weisberg, New York City, for plaintiffs Goldfarb and Weisberg.

Teitler & Teitler by Michael F. Teitler, New York City, for plaintiff World Airways, Inc.

Allen G. Schwartz, Corp. Counsel by Bruce S. Kaplan, Chief Asst. Corp. Counsel, John F. Grubin, Steven Been, James M. Kaplan, Asst. Corp. Counsels, New York City, of counsel, for municipal defendants City of New York, Abraham Beame and Harrison Goldin.

Barry R. Ostrager, Kathleen Schaaf, Simpson, Thacher & Bartlett, New York City, for Manufacturers Hanover Trust Co.

Irwin J. Sugarman, Schulte & McGoldrick, New York City, for Ehrlich-Bober & Co., Inc.

Robert P. Beshar, New York City, for Weeden & Co.

M. William Munno, Paul Batista, Seward & Kissel, New York City, for Bank of America.

Stephen A. Weiner, Robert J. Sussman, Winthrop, Stimson, Putnam & Roberts, New York City, for Bear, Stearns & Co.

Laura B. Hoguet, Richard J. Holwell, White & Case, New York City, for Bankers Trust Co.

Ronald L. Cohen, Donovan, Leisure, Newton & Irvine, New York City, for A. G. Becker & Co., Inc.

Thomas A. Shaw, Jr., Breed, Abbott & Morgan, New York City, Paul B. Galvani, George M. Moriarty, Ropes & Gray, Boston, Mass., for First Nat. Bank of Boston.

Evan A. Davis, Edmund H. Kerr, Cleary, Gottlieb, Steen & Hamilton, New York City, for Salomon Bros.

Lowell G. Harriss, Davis, Polk & Wardwell, New York City, for Morgan Guaranty Trust Co.

W. Foster Wollen, Paul A. Merolla, Shearman & Sterling, New York City, for Citibank, N. A.

Richard C. Casey, Joseph G. Riemer, III, Brown, Wood, Ivey, Mitchell & Petty, New York City, for Merrill Lynch, Pierce, Fenner & Smith, Inc.

Gregory A. Markel, Cravath, Swaine & Moore, New York City, for Chemical Bank.

Jon Paul Robbins, Nitkin, Alkalay, Handler & Robbins, New York City, for First Pennco Securities Inc.

Briscoe R. Smith, Toni C. Lichstein, Milbank, Tweed, Hadley & McCloy, New York City, for The Chase Manhattan Bank, Nat. Assn.

## OPINION

OWEN, District Judge.

In this multi-faceted litigation, before me for pretrial purposes pursuant to an order of the Judicial Panel on Multidistrict Litigation, there are various motions to dismiss. These actions have a common origin in the near financial collapse of the City of New York in late 1974 and early 1975.[1] The several complaints allege that the City of New York, former Mayor Abraham Beame

---

1. *See SEC Staff Report on Transactions in Securities of the City of New York* (1977).

and Comptroller Harrison Goldin (the "City Defendants"), and certain banks and brokerage firms (the "Underwriter and Seller Defendants") deliberately misled the public as to the City's desperate financial condition in connection with the underwriting and subsequent resale of various New York City obligations issued during 1974 and 1975.[2] Plaintiffs allege that the foregoing constitutes violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act" or the "1933 Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act" or the "1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.

Eleven separate lawsuits have been consolidated for pretrial matters in this litigation.[3] In five of the actions, the City is named as a defendant along with the underwriters and sellers.[4] Two of the actions have been certified as class actions pursuant to Fed.R.Civ.P. 23(b)(3), *Friedlander v. City of New York*, 71 F.R.D. 546 (S.D.N.Y. 1976), and *Spector v. City of New York*, 71 F.R.D. 550 (S.D.N.Y.1976). In *Friedlander*, plaintiffs allege that on June 1, 1974, New York City had outstanding $4.4 billion in short-term notes, of which the defendant banks held approximately $3.5 billion, and of which large clients of the defendant brokers owned approximately $900 million. (Plaintiff's Complaint at ¶ 31.) According to the complaint, on the basis of "inside"

information that the City was unable to repay these obligations, the underwriter defendants underwrote for distribution to the general public approximately $2.6 billion of the City's notes. The proceeds of these sales were allegedly to be used to "bail out" the banks' and brokerage firms' own holdings of City notes by reducing those holdings from $4.4 billion in June 1974 to $1.9 billion in June 1975. The City of New York and its Mayor and Comptroller are alleged to have aided and abetted the foregoing acts by, *inter alia*, concealing the City's critical financial condition from the public and falsifying certain records to conceal the fiscal crisis. The *Friedlander* class consists of the first non-dealer purchasers of the City's Revenue Anticipation Notes (the "RANS") issued on December 13, 1974, January 13, 1975, February 14, 1975 and the City's Bond Anticipation Notes issued March 12, 1975. *See Friedlander v. City of New York*, 71 F.R.D. 546, 548 (S.D.N.Y. 1976).

The *Spector* class consists of the holders of the City's general obligation bonds who purchased such bonds between May 1, 1974 and September 30, 1975. Plaintiffs allege that the commercial banks and brokerage firms conspired to conceal information as to the City's desperate financial condition from the investing public. These acts of concealment, along with other short term steps designed to avoid default, were al-

2. The underwriter and seller defendants include the Chase Manhattan Bank, N.A., First National City Bank, Manufacturers Hanover Trust Company, The First National Bank of Boston, Chemical Bank, Bank of America N.T. & S.A., Morgan Guaranty Trust Company of New York, Bankers Trust Company (the "Banks"), and Weeden & Co., Inc., A. G. Becker & Co., Inc., Bear, Stearns & Co., Ehrlich–Bober & Co., Inc., First Pennco Securities, Inc., Salomon Brothers, Merrill Lynch, Pierce, Fenner & Smith, Inc. (the "Brokers").

3. This court has jurisdiction for pretrial purposes over the following cases: *Truncell v. The First National Bank of Boston*, 76–3285–C (D.Mass.1976); *Friedlander v. The First National Bank of Boston*, 76–2685–T (D.Mass. 1976); *Truncell v. Bank of America N.T. & S.A.*, C76–1873–SC (N.D.Cal.1976); *World Airways, Inc. v. Bank of America, N.T. & S.A.*,

C78–0042–WAI (N.D.Cal.1978); *Friedlander v. Bank of America N.T. & S.A.*, C76–1432–SAW (N.D.Cal.1976); *World Airways, Inc. v. Salomon Brothers*, 78 Civ. 0072 (S.D.N.Y.1978); *Spector v. City of New York*, 75 Civ. 5461 (S.D.N.Y.1975); *Weisberg v. City of New York*, 75 Civ. 5582 (S.D.N.Y.1975); *Velardi v. First National City Bank*, 76 Civ. 0843 (S.D.N.Y. 1976); *Manchester v. City of New York*, 77 Civ. 0990 (S.D.N.Y.1977); *Goldfarb v. City of New York*, 75 Civ. 5581 (S.D.N.Y.1975). In the *Bank of America* and *First National Bank of Boston* cases, venue for trial purposes is set forth in The National Bank Act, 12 U.S.C. § 94.

4. The City is a named defendant in *Friedlander v. City of New York, supra; Spector v. City of New York, supra; Goldfarb v. City of New York, supra; Weisberg v. City of New York, supra; Manchester v. City of New York, supra.*

legedly taken to preserve prevailing bond prices to allow the defendants to profitably dispose of their own holdings of City bonds. Certain of the defendants are said to have reduced their holdings in City bonds from $2.5 billion on May 1, 1974 to virtually nil by the time the prices of those bonds plummeted. Here, as in *Friedlander*, the City is alleged to have aided and abetted this conspiracy by virtue of material misrepresentations and nondisclosures to the public concerning the City's finances. Plaintiffs contend that as a result of the acts of the City defendants and the underwriter and seller defendants, the members of the class—predominately "after-market" purchasers of the City general obligation bonds—incurred substantial economic losses.

The allegations in *Goldfarb, Weisberg* and *Manchester* are essentially the same as those in *Friedlander* and *Spector*. The remaining cases, while not alleging securities fraud on the part of the City defendants, allege violations of § 17(a) of the Securities Act and/or § 10(b) of the Securities Exchange Act by certain of the commercial banks or brokerage firms.[5] It is undisputed that all of the conduct at issue occurred prior to the enactment of the 1975 amendments to the Securities Exchange Act.

The City and the underwriter and seller defendants move to dismiss for failure to state a claim upon which relief may be granted, Fed.R.Civ.P. 12(b)(6),[6] on the following legal theories:

(1) That transactions involving municipal securities, whether by the City, the underwriters or other sellers, are not covered by § 10(b) of the Securities Exchange Act; and, consequently, no private right of action

is conferred upon a purchaser of such securities; and

(2) That while § 17(a) of the Securities Act expressly includes municipal securities and has been construed to confer enforcement rights upon the Securities Exchange Commission ("SEC") in the event of violations, it does not confer a private right of action upon an investor; and

(3) That if the antifraud provisions of the securities laws apply to municipal securities, the tenth amendment to the United States Constitution would render such provisions unconstitutional as applied to the City defendants.

In the alternative, certain of the underwriter defendants argue that if a private right of action *does* exist as to them with respect to transactions in municipal securities, it must also be implied against the City as issuer.

From a careful consideration of the 1933 and 1934 Acts (and their amendments) viewed in the light of their extensive legislative histories and the relevant case law, I conclude that the motions of the City defendants to dismiss should be granted, while those of the underwriter and seller defendants should be denied.

*I. The Applicability of § 10(b) of the Securities Exchange Act to Municipal Securities and to the Underwriters and Sellers Thereof*

The threshold question presented is whether the private right of action unquestionably available to a purchaser of corporate securities under § 10(b) of the 1934 Act,[7] and Rule 10b–5 promulgated thereun-

---

**5.** In one of these cases, *World Airways, Inc. v. Salomon Brothers*, 78 Civ. 0072 (S.D.N.Y.1978), the plaintiff has advised the court that it will amend its complaint to join the City as a defendant if the instant motions are denied.

**6.** Plaintiff World Airways has submitted a motion for partial summary judgment pursuant to Fed.R.Civ.P. 56(c). Argument on this motion has been deferred by the court until after decision on the motions to dismiss.

**7.** Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or any facility of any national securities exchange  .  .  . .

.　　.　　.　　.　　.

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or

der,[8] is equally available to a purchaser of municipal securities. This is "basically a matter of statutory construction." *Trans-America Mortgage Advisors v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed. 146 (1979).

█ The Securities Exchange Act was designed "to provide for the regulation of securities exchanges and of the over-the-counter markets . . . to prevent inequitable and unfair practices in such exchanges and markets . . ." S.Rep.No. 792, 73d Cong. 2d Sess. 1 (1934). Nevertheless, Congress, by including § 3(a)(12), 15 U.S.C. § 78c(a)(12), in the 1934 Act, clearly contemplated that, at least for some purposes, governmental securities, including those of municipalities, would be exempted from certain of its requirements. The defendants argue that the mere inclusion of § 3(a)(12) in the 1934 Act evidences a Congressional intent to exempt municipal securities from the operation of § 10(b). I reject this contention.

█ At the time of the events in question, § 3(a)(12) defined an "exempted security" as follows:

The term "exempted security" or "exempted securities" includes securities which are direct obligations of or obligations guaranteed as to principal or interest by the United States; . . . securities which are direct obligations of or obligations guaranteed as to principal or

interest by a State or any political subdivision thereof, or by any agency or instrumentality of a State or any political subdivision thereof, or by any municipal corporate instrumentality of one or more states; . . . and such other securities . . . as the Commission may, by such rules and regulations as it deems necessary or appropriate in the public interest or for the protection of investors, . . . exempt from the operation of any one or more provisions of this chapter which by their terms do not apply to an "exempted security" or to "exempted securities."

1934 Act, ch. 404, § 3, 48 Stat. 882. This section is strictly definitional. Whether or not a given substantive section applies to "exempted securities" is left to the express language of the particular section. In the Senate Report on the 1934 Act, the draftsmen confirm this view by noting that a "large number of the provisions in the Act expressly include 'exempted securities' ".[9] In short, when Congress wanted to exclude exempted securities from a section of the Act, it knew how to do so.[10] It is significant, therefore, that the language of § 10(b) does not evidence such an intent. That section makes it unlawful for "any person . . . to use or employ, in connection with the purchase or sale of *any security* registered on a national securities exchange or any security not so registered, any mani-

---

appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j(b).

**8.** Rule 10b–5 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or any facility of any national exchange,
(a) to employ any device, scheme or artifice to defraud,
(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

**9.** S.Rep.No.792, 73d Cong., 2d Sess. 14 (1934).

**10.** Congress expressly excluded exempted securities from the following sections by stating that those sections applied to "any securities (other than exempted securities)": § 7(a) (margin rules), 15 U.S.C. § 78g(a); § 8(a) (restrictions on borrowing by members, brokers and dealers), 15 U.S.C. § 78h(a); § 9(f) (manipulation of security prices), 15 U.S.C. § 78i(f); § 12(a) (registration requirements for securities), 15 U.S.C. § 78*l*(a); § 14(a) (proxy rules), 15 U.S.C. § 78n(a); § 15(a)(1) (registration of brokers and reporting requirements in over-the-counter markets), 15 U.S.C. § 78*o*(a)(1); § 16(a), (b), (c) (insider trading and reporting requirements), 15 U.S.C. § 78p(a), (b), (c).

pulative or deceptive device . . .." (emphasis added). The Congressional intent to have § 10(b) extend to fraudulent conduct in connection with all securities in the broadest sense, including those defined in § 3(a)(12), could not be clearer. The draftsmen not only omitted reference to "exempted securities," they also specifically included both registered and unregistered securities, as well as transactions both on the national securities exchanges and in the over-the-counter market.

The legislative history of § 3(a)(12) further demonstrates that it serves only to define "exempted securities." The original draft of § 3(a)(12) expressly exempted only United States Government securities,[11] and the Federal Trade Commission was to be vested with the authority to broaden the scope of § 3(a)(12).[12] In discussing this grant of authority, the draftsmen wrote:

> A large number of provisions in the act expressly exclude "exempted securities." Thus the Commission is able to *remove from the operation of any one or more of these provisions* any securities as to which it deems them inappropriate.

H.R.Rep.No.1383, 73d Cong., 2d Sess., 17 (1934) (Emphasis added); *see also* S.Rep.No. 792, 73d Cong., 2d Sess. 14 (1934). Thus, Congress granted the Commission the authority to add other securities to the list of exempted securities, but it did not empower the Commission to exclude "exempted securities" from other sections of the Act. That Congress later expanded the definition of "exempted securities" to include those of state and municipal issuers does not alter the limited function of § 3(a)(12).

It is also clear that obvious political considerations motivated Congress to enact the exemptions it eventually provided for mu-nicipal securities in the 1933 and 1934 Acts. *Landis, The Legislative History of the Securities Act of 1933*, 28 Geo.Wash.L.Rev. 29, 39 (1959). The political, as well as economic, justifications underlying § 3(a)(12) are most visible in the Congressional hearings on the 1934 Act. Paramount among the political concerns was the impact on federal-state relations of vesting the Federal Trade Commission with the *discretionary* authority to affect the credit of a state or municipality. Senate Hearings, *supra*, at 7477. In testimony before the Senate, George B. Gibbons, a New York City municipal bond dealer, highlighted the danger of vesting such power in the Federal Trade Commission:

> State bonds and the bonds of their political subdivisions and agencies are not exempted by the provisions of this Act, and they are under the power of the Federal Trade Commission. That gives them, if they so care to use it, a very dangerous power over the financial affairs of all the states, cities, counties and political subdivisions and agencies in them; and it might be exercised to their great disadvantage.
>
> The credit of a state, or a municipality or agency within it, and its ability to finance its many needs for roads, schools, preservation of health, and so on, would be seriously crippled by the refusal of the Federal Trade Commission to exempt its bonds or by the imposing of unreasonable conditions for granting such exemptions, and cause irreparable damage and loss to both the State or municipality and to the holders of their outstanding bonds by the withdrawal of exemption in cases where it had once been granted.

---

**11.** Under the earlier versions of the bill, the Federal Trade Commission was empowered to grant additional exemptions in the public interest. *Compare* H.R.Rep.No.1383, 73d Cong., 2d Sess. 17 (1934) (House Report accompanying H.R. 9323) *with* H.R.Rep.No.1838, 73d Cong., 2d Sess. 4 (1934) (Conference Report accompanying H.R. 9323).

**12.** Testimony before both the House and Senate Committees shows that the draftsmen of the Act believed that the Federal Trade Com-mission would take up the question of exempting municipal securities. *See Hearings Before House of Representatives Committee on Interstate and Foreign Commerce on H.R. 7852 and H.R. 8720*, 73d Cong., 2d Sess. 818–24 (1934) ("House Hearings"); *Stock Exchange Practice: Hearings Before the Senate Banking and Currency Committee on S.Res. 84 and S.Res. 56 and S.Res. 97*, 73d Cong., 2d Sess. 7475–76 (1934) ("Senate Hearings").

Senate Hearings, *supra*, at 7446.[13] In fact, these very same objections prompted one member of the House Committee to note that "a real [constitutional] question" existed as to "the power of Congress to place any burden upon a state in the marketing of its bonds . . . ." House Hearings, *supra*, at 822.

An equally compelling argument was addressed to Congress detailing the economic impact of failing to include state and municipal obligations in § 3(a)(12). Numerous witnesses observed that the failure to provide a blanket exemption for municipal and state obligations, while providing such an exemption for securities of the federal government, would impose a serious economic burden on the nonexempted securities. *See, e. g.*, House Hearings, *supra*, at 721. As one witness explained to the Senate Committee:

> The inclusion of State and municipal bonds in the bill does not confer 'any benefit on the holders of municipal bonds nor on the municipalities issuing them. On the contrary, it imposes a very distinct hardship on both municipalities and the purchasers of their bonds and will seriously affect their value as an investment. The exemption of a municipal bond would not add to its present value, and refusing exemption would seriously impair its value.
>
> If being exempted from this bill is helpful to the United States Government bonds, certainly States and municipalities need that help also. If not being exempted would be harmful to Government bonds, certainly States and municipalities should not suffer that harm.

Senate Hearings, *supra*, at 7445. *See also id.* at 7444.[14]

It was also urged that municipal securities were simply not subject to the same "speculative abuses" as were corporate securities because: (1) there is "practically no speculation" in the municipal market; (2) the purchasers of municipal securities are large, sophisticated public institutions and corporations; and (3) the relatively small number of municipal securities made it "almost impossible to effect wash sales" and "practically impossible to sell municipal bonds short." *See* Senate Hearings, *supra*, at 7443.

■ As this legislative history documents, the addition of municipal and state securities to the category of "exempted securities" as defined in § 3(a)(12) evidences essentially a Congressional decision to avoid the political and economic consequences of unequal treatment of federal, state and municipal securities. It does *not* reflect a legislative intent to exempt municipal securities from the provisions of § 10(b) of the 1934 Act. On the contrary, the legislative debates over the scope of the § 3(a)(12) definition of "exempt securities" compel just the opposite conclusion.

Of paramount concern to the draftsmen of the original version of § 3(a)(12)—the same individuals who drafted § 10(b)—was the protection of investors in municipal and state securities. Thus, it is quite clear from the legislative record that the draftsmen's initial omission of municipal securities from § 3(a)(12) can be explained by the fact that at the time it was drafted approximately 17,300 municipalities—about 1% of the municipalities in America—were either delinquent or in default. House Hearing, *supra*, at 822.[15] *See also* Senate Hearings, *supra*,

---

**13.** *Cf. National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). Similar considerations may explain the absence of any mention of municipalities, states or the federal government in the definition of "persons" in § 3(a)(9) of the 1934 Act.

**14.** There were specific objections to the application to municipal securities of the proposed margin requirements, capital requirements for dealers, regulation of the over-the-counter market and prohibitions on market stabilization.

*See, e. g.*, Senate Hearings, *supra*, at 6839–40, 7068–69, 7432–34, 7441–43.

**15.** Default had occurred in about $1,500,-000 worth of bonds. This figure, while substantial in size, is somewhat deceptive. It represents the total dollar value of issues in which there had been some nonpayment; any delinquency caused the entire debt of that issuer to be considered in default. *See* House Hearings, *supra*, at 822; Senate Hearings, *supra*, at 7443.

at 7413. Congress was apparently convinced that these investors were entitled to the fullest possible protection with regard to these securities. Senate Hearings, *supra*, at 7477. *See also* House Hearings, *supra*, at 821, 822.

Thus, while the desire to maintain political and economic parity among governmental issuers led to the eventual inclusion of municipal securities in the definition of "exempted securities," Congressional concern for investor protection from the practices of certain *sellers* of municipal securities remained. In an exchange that suggests the reason that "exempted securities" were *not* expressly excluded from § 10(b), Senator Gore inquired:

Is there any way that you could vest the administrative agency with the power to forewarn prospective purchasers that the bond of a certain town is a bad investment? Is there any red light at all? One of the objects of this bill is to protect the fool against his follies. I do not know whether they can do it or not, but I do not see any difference between the man that loses his money by buying municipal bonds that are no good, I do not see that he is any better off than if he put it in a railroad bond or a chewing-gum factory bond or something of that sort. He lost his money . . . . .

Senate Hearings, *supra*, at 7450. In fact, evidence of fraud and misrepresentations in the sale of municipal securities to the public was frequently brought to the attention of the Senate Committee. *See* Senate Hearings, *supra*, at 232.

Finally, strong support for the view that the draftsmen of § 10(b) and § 3(a)(12) were concerned with protecting the *investor* in municipal securities may be found in the testimony of Commissioner Landis.[16] In response to Representative Pettengill's charge that municipal securities were being "overregulated" by the proposed draft of the 1934 Act, Commissioner Landis stated:

Well, in answer to your first question, I would have to answer that first question yes, there are abuses there [in the municipal securities market]. How widespread they are, and how important they are is a pretty hard matter to guess at, . . . . , and we cannot, of course, say there are no abuses in the trading of municipal securities. Unquestionably there are salesmen who trade in municipal securities, deal in them, sell them, and will not tell the purchasers that they are in default. They are not reputable salesmen, of course, but there have been things like that done, unquestionably.

Furthermore, one of the things in municipal securities is that you must differentiate between general obligations of a municipality, and special obligations . . . . That distinction is often not made by the salesman. It escapes the prospective purchaser of these bonds, and sometimes because the salesman wishes it to escape.

House Hearings, *supra*, at 897. Based on this legislative history, I must conclude that while municipal securities were ultimately included in the definition of "exempt securities" in § 3(a)(12), they were not thereby removed from the strictures of § 10(b) of the 1934 Act.

■ The case law supports the existence of an implied cause of action under § 10(b) of the 1934 Act in favor of purchasers of municipal securities. The Supreme Court's decision in *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), where the underlying securities were United States Treasury bonds, firmly established a private cause of action under § 10(b) in favor of the seller of any securities—whether or not exempted under § 3(a)(12). The unanimous Court stated in broad language that "[s]ection 10(b) outlaws the use 'in connection with the purchase or sale' of any security of 'any manipulative or deceptive device or contrivance,'" 404 U.S. at 10, 92 S.Ct. at 168. In a footnote the Court added "[s]ec-

---

**16.** The Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), credited Commissioner Landis with a crucial role in the drafting of the 1934 Act.

tion 3(a)(10) of the 1934 Act defines 'security' very broadly . . . and clearly embraces Treasury bonds." [17]   404 U.S. at 10 n.6, 92 S.Ct. at 168.   Thus, the *Superintendent* result demonstrates that the definition of a "security" for the purposes of § 10(b) includes all those securities enumerated in § 3(a)(10), including municipal securities.

Defendants argue that *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 1946 (1979) and *Touche Ross & Co. v. Reddington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) undermine the holding of *Superintendent of Insurance.* I reject this contention.   *Cannon* recognized that although the language of § 10(b) is merely duty-creating, as opposed to right-creating, ever since "*Superintendent of Insurance,* the [Supreme] Court [has] explicitly acquiesced in the 25 year-old acceptance by the lower federal courts of 10b–5 causes of action.   *See also Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 196, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668; *Blue Chip Stamps v. Manor Drug,* 421 U.S. 723, 730, 95 S.Ct. 1917, 1922, 44 L.Ed.2d 539." *Cannon v. University of Chicago, supra,* at 692 n.13.   *Superintendent of Insurance* "reflects the unique history of Rule 10b–5," *Cannon v. University of Chicago, supra,* at 738 (Powell, J., dissenting), and its holding is unaffected by recent decisions applying a more restrictive standard on implication of private rights of action.

█   Other federal courts that have considered the question almost uniformly favor the implication of a private remedy under § 10(b) and Rule 10–5 on behalf of purchasers of exempted securities.   *See, e. g., Shapiro v. Schwamm,* 279 F.Supp. 798 (S.D.N.Y.1968); *Texas Continental Life Insurance Co. v. Bankers Bond Co., Inc.,* 187 F.Supp. 14 (W.D.Ky.1960), *rev'd on other grounds sub nom. Texas Continental Life Insurance Co. v. Dunne,* 307 F.2d 242 (6th Cir. 1962), *settlement agreement enforced sub nom. All States Investors Inc. v. Bankers Bond Co., Inc.,* 343 F.2d 618 (6th Cir.), *cert. denied,* 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965); *Thiele v. Shields,* 131 F.Supp. 416 (S.D.N.Y.1955); *Greenwich Savings Bank v. Shields,* 131 F.Supp. 368 (S.D.N.Y.1955); *Connecticut Mutual Life Insurance Co. v. Shields,* 131 F.Supp. 363 (S.D.N.Y.1954); *Baron v. Shields,* 131 F.Supp. 370 (S.D.N.Y. 1954).   Moreover, courts have uniformly rejected the argument advanced here by the defendants that because the express civil liability provisions of § 12(2) of the 1933 Act, 15 U.S.C. § 77*l*(2),[18] exempt governmental securities,[19] purchasers of those se-

---

**17.** Nothing in the legislative history of the 1934 Act suggests that § 10(b) was intended to include United States Treasury bonds but to exclude municipal securities.

**18.** Section 12(2), 15 U.S.C. § 77*l*(2), provides:
Any person who—
(1) offers or sells a security in violation of section 77e of this title, or
(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission) and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care

could not have known, of such untruth or omission,
shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

**19.** Section 3(a)(2), 15 U.S.C. § 77c(a)(2), which is almost identical to § 3(a)(12) of the 1934 Act, defines exempted securities as follows:
(a) Except as hereinafter expressly provided, the provisions of this subchapter shall not apply to any of the following classes of securities:

.     .     .     .     .

(2) Any security issued or guaranteed by the United States or any territory thereof, or by the District of Columbia, or by any State of the United States, or by any political subdivision of a State or territory, or by any public instrumentality of one or more States

curities should not be permitted to circumvent that exception by suing under § 10(b) of the 1934 Act.[20] In *Thiele v. Shields, supra,* the court explained:

> That Congress intended to exempt a seller of municipal bonds from liability for failure to prove that he exercised reasonable care in investigating the truth of a representation is not inconsistent with the subjection to civil liability of the same seller after the purchaser proves that he knowingly misrepresented a fact.

131 F.Supp. at 419.[21]    *Accord, Baron v. Commercial Industrial Bank* [1979] Fed.Sec. L.Rep. (CCH) ¶ 96,826 (S.D.N.Y.1979); *Connecticut Mutual Life Insurance Co. v. Shields, supra; Greenwich Savings Bank v. Shields, supra; Baron v. Shields, supra;* compare 3 Loss *Securities Regulation* 1778–91 (2d ed. 1961) and 6 Loss *Securities Regulation* 3917 (1969) *with* 1A Bromberg *Securities Law: Fraud—SEC Rule 10b–5* § 2–4(2)(3) (1977); [22] *cf. Weber v. C. M. P. Corp.,*

---

or territories, or by any person controlled or supervised by and acting as an instrumentality of the Government of the United States pursuant to authority granted by the Congress of the United States; or any certificate of deposit for any of the foregoing; . . ."

**20.** The plaintiff purchaser suing under § 10(b), as opposed to § 12(2), avoids the restrictive provisions of the 1933 Act. Specifically, he circumvents the one year statute of limitations imposed by § 13 and the rescission measure of damages provided in § 12(2). However, as discussed *infra,* the plaintiff-purchaser must bear the much heavier burden of proving scienter when suing under § 10(b), and he loses the advantage of the 1933 Act requirement that the defendant carry the burden of going forward with his "due diligence" defense. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). *See generally* note 23, *supra.*

**21.** *Thiele* relied on the rationale of *Kardon v. National Gypsum,* 69 F.Supp. 512 (E.D.Pa. 1946) and *Fischman v. Raytheon Manufacturing Co.,* 188 F.2d 783 (2d Cir. 1951), i. e., a tort theory of recovery, as a basis for implying a private cause of action under § 10(b). Defendants argue that recent decisions rejecting the *Kardon-Fischman* rationale effectively overrule *Thiele* and its progeny. However, given the Supreme Court's acknowledgment of the existence of a § 10(b) cause of action, *Cannon v. University of Chicago, supra,* at 1955 n.13, as well as the acceptance of the *Kardon-Fischman* rationale in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), and *Ernst & Ernst v. Hochfelder, supra,* the defendant's position must be rejected. *See, Ross v. A. H. Robbins Co.,* 607 F.2d 545 (2d Cir. 1979) (a post-*Cannon* affirmation of the applicability of the *Kardon-Fischman* rationale in the context of § 10(b)).

**22.** Professor Loss points out the anomalies created by the implication of a private right of action under § 10(b), but fails to acknowledge the anomalies created by other possible interpretations. The Ninth Circuit in *Ellis v. Carter,*

291 F.2d 270, 272–74 (9th Cir. 1961), sets forth four possible constructions of § 10(b) and explains the difficulties presented by each one:

(1) As permitting no civil actions to either buyer or seller on the ground that the 1933 and 1934 acts were too closely drafted to permit the inference of any private remedies in addition to those expressly provided in sections 11 and 12 of the 1933 act, and sections 9(e), 16(b) and 18(a) of the 1934 act. But under such a construction defrauded sellers are given no civil remedy under either act, which seems inconsistent with the all-embracing scope of the legislation and requires that an unexplained distinction be drawn between buyers and sellers.

(2) As permitting sellers but not buyers to sue under the rule, thereby giving both buyers and sellers a civil remedy but limiting that of buyers to the remedies provided in the 1933 act. But this seems inconsistent with the fact that section 10(b) and rule 10b–5 are expressly applicable to buyers as well as sellers. Moreover, there seems to be no good reason why Congress would want to restrict buyers to the limited remedies provided in the 1933 act, while giving sellers an unrestricted civil remedy. The converse inference—drawn by reading the restrictions of the 1933 act which apply only to buyers as applicable also to sellers under the 1934 act—would constitute judicial rewriting which even appellees concede would be too gross.

(3) As permitting buyers as well as sellers to sue under the 1934 act, but to make buyers' actions thereunder subject to the same restrictions as provided for them in the 1933 act. This avoids the anomaly of giving the buyer a less restricted remedy under the 1934 act than he has under the 1933 act. In effect, however, it is the same as giving him no right under the 1934 act, leaving an unexplained distinction between buyers and sellers as noted above.

(4) As permitting buyers as well as sellers to sue under section 10(b) and rule 10b–5 without any distinction whatever, free of the restrictions imposed under the 1933 act.

242 F.Supp. 321 (S.D.N.Y.1965).[23]

In the present litigation, the plaintiffs allege that the commercial banks and brokerage firms engaged in a conspiracy to defraud the purchasers of New York City bonds and notes. The language and legislative history of § 10(b), as well as the legal precedents recognizing an implied private remedy on behalf of the defrauded purchasers, support the conclusion that § 10(b) applies to municipal securities and to the underwriters who sell them. The underwriter and seller defendants' motion to dismiss the § 10(b) cause of action as to them is accordingly denied.

> This construction has the virtue of giving both buyers and sellers a civil remedy and giving buyers the same unrestricted remedy which is given to sellers, no reason being shown why Congress should have intended to treat them differently. But this construction is saying in effect that the procedural restrictions which Congress carefully provided in the 1933 act with regard to a buyer's civil remedy were completely nullified or ignored by Congress a year later in giving buyers an unrestricted civil remedy.
>
> In *Matheson* [*v. Armbrust*, 284 F.2d 670 (9th Cir. 1960)] we adopted the fourth of these alternatives. We now adhere to that determination. Recognizing the anomaly inherent therein, as noted above, we consider it the most acceptable of the four possible alternatives. It gives controlling weight to what seems to have been the dominant policy of Congress to provide complete and effective sanctions, public and private, with respect to the duties and obligations imposed under the two acts. It requires no variance in procedures under the 1934 act as between buyer and seller, no reason appearing why Congress would have wanted the procedures to be different. While it assumes that Congress in 1934 undid what it carefully did in 1933, it avoids judicial rewriting of the 1934 act to include procedural provisions which appear only in the 1933 act. As between two acts which deal with the problem, it permits the most recent enactment to govern. . . ."

Although the court goes on to conclude that a cause of action under § 10(b) could be sustained without a showing of *scienter*, a view repudiated by the Supreme Court in *Ernst & Ernst v. Hochfelder, supra,* the conclusion that purchasers should be entitled to sue under § 10(b) is consistent in all other respects with decisions in this circuit. *See, e. g., SEC v. Texas Gulf Sulphur,* 401 F.2d 833, 864 (2d Cir.

## II. The Applicability of § 10(b) to Municipal Issuers: The City of New York and its Officials

■ On its motions to dismiss, the City first contends that § 10(b) does not apply to municipalities. Although I have concluded that § 10(b) extends to *transactions* in municipal securities, I also conclude that as "person" is defined in the 1934 Act, liability under § 10(b) does not reach a municipal issuer.

Section 10(b), and Rule 10b–5 promulgated thereunder, make it unlawful for "any person" to engage in fraud in the sale or purchase of "any security." At the time of

1968), *cert. denied sub nom. Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969) (Friendly, J. concurring); *Forman v. Community Services Inc.,* 500 F.2d 1246 (2d Cir. 1974) *rev'd on other grounds sub nom. United Housing Foundation v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). *Cf. Weber v. C. M. P. Corp.,* 242 F.Supp. 321 (S.D.N.Y.1965) (criticizing the *Ellis* court for not requiring *scienter* in § 10(b) actions).

23. In *Blue Chip Stamps v. Manor Drug Stores, supra,* the Court left open

> the question of whether an implied action under § 10(b) of the 1934 Act and Rule 10b–5 will lie for actions made a violation of the 1933 Act and the subject of express civil remedies under the 1933 Act. Compare *Rosenberg v. Globe Aircraft Corp.,* 80 F.Supp. 123 (E.D.Pa.1948), with *Thiele v. Shields,* 131 F.Supp. 416 (S.D.N.Y.1955).

*Id.* 421 U.S. at 752 n.15, 95 S.Ct. at 1933. Since *Thiele* the lower federal courts have unanimously recognized an implied cause of action under § 10(b) in favor of purchasers alleging fraud, as opposed to mere negligent misrepresentation, in the sale of securities. The *Rosenberg* decision, which denied the more liberal venue provision available under § 10(b) to a plaintiff whose allegations fell within the express provisions of the 1933 Act, has not been followed in this circuit. *See generally* 1 Bromberg, *Securities Law: Fraud—SEC Rule 10b–5* § 2.4(2) n.76 ("*Rosenberg v. Globe Aircraft Corp.* . . . can no longer be regarded as valid."). It is inconceivable that Congress intended to subject the defrauding party in the initial distribution to the rescission measure of damages available under § 12(2) of the 1933 Act, while subjecting the wrongdoer in the aftermarket to the market measure of damages under § 10(b) of the 1934 Act.

the events in suit, and prior to its amendment on June 4, 1975, § 3(a)(9) of the 1934 Act defined "person" as follows:

> The term "person" means an individual, a corporation, a partnership, an association, a joint-stock company, a business trust, or an unincorporated organization.

1934 Act, ch. 404, § 3(a)(9), 48 Stat. 882. This definition of "person" does not, by its terms, apply to municipalities, states or the federal government.[24] Nor can such entities be included by implication. This is clear from a comparison of § 3(a)(9) of the 1934 Act with § 2(2) of the 1933 Act, 15 U.S.C. § 77b(2), in which Congress expressly included governmental entities:

> The term 'person' means an individual, a corporation, a partnership, an association, a joint-stock company, a trust, any unincorporated organization, *or a government or political subdivision thereof.*[25]

(Emphasis added.) Moreover, in June of 1975, Congress found it necessary to amend § 3(a)(9) to expressly include a "government, or political subdivision, agency, or instrumentality of a government." Pub.L. No.94–29, § 3, 89 Stat. 97 (1975), 15 U.S.C. § 78c(a)(9) (1977 Supp.). Thus, the omission of express reference to these entities in § 3(a)(9) of the 1934 Act reflects a decision *not* to include governments within that section.

■ While the plaintiffs and certain defendants argue, nonetheless, that the difference between the definition of "person" in the 1934 Act and the 1933 Act are merely "stylistic," the legislative history and statu-

tory framework of the securities laws contradict this view. Regulation of governmental instrumentalities was carefully avoided in both the 1933 and 1934 Acts. Congressional reluctance to subject governmental issuers to the civil liability provisions of the securities laws is clearly expressed in the House Report accompanying the 1933 Act. There, the House Committee, explaining the reasons for the § 3(a)(2) exemption for governmental issuers, stated:

> Paragraph (2) exempts United States, Territorial and State obligations, or obligations of any political subdivision of these governmental units. The term "political subdivision" carries with it the exemption of such securities as county, town, or municipal obligations, as well as school district, drainage district, . . .
> The line drawn by the expression 'political subdivision' corresponds generally with the line drawn by the courts as to what obligations of States their units and instrumentalities created by them, are exempted from Federal taxation. *By such a delineation, any constitutional difficulties that might arise with reference to the inclusion of state and municipal obligations are avoided.*

H.R.Rep.No.85, 73d Cong., 1st Sess. 14 (accompanying H.R. 5480) (emphasis added). These same constitutional limitations, real or imagined, upon Congress's authority to subject governmental issuers to the regulatory scheme were an obvious factor leading to the exemption of such issuers from § 5 and § 12(2) of the 1933 Act.[26] One year

---

24. Although the plaintiffs and underwriter defendants argue that the term "corporation" in § 3(a)(9) covers municipal corporations, that position is wholly inconsistent with the legislative history of the 1934 Act. As discussed above, the draftsmen of the 1934 Act were *extremely concerned with maintaining a balanced treatment of governmental entities.* The statutory construction urged by these parties would impute to Congress an intent to subject municipalities to § 10(b) liability, while simultaneously excluding states and the federal government from those provisions. This construction is simply unsupportable.

25. By virtue of 17 C.F.R. § 240–01(b), the definition of "person" in § 3(a)(9) applies to Rule 10b–5, 17 C.F.R. § 240.10b–5.

26. Section 17(a), 15 U.S.C. § 77q(a), is the only provision of the 1933 Act to which the § 3(a)(2) exemption for governmental issuers does not apply. It provides that:

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or

later, after further hearings on the constitutional, political and economic impact of regulations affecting governmental issuers, Congress continued to be of the same view and exempted transactions in government obligations from certain provisions of the 1934 Act.[27] The definition of "person" in the 1934 Act, operating as it does to remove governmental instrumentalities from the civil liability provisions of § 10(b), simply furthers the Congressional policy announced in the 1933 Act.

■ This analysis is not inconsistent with my earlier conclusion that Congress intended underwriters and sellers to be liable under § 10(b) for their own independent fraudulent conduct in connection with municipal securities. The underwriter defendants argue, by analogy, that since § 12(2) of the 1933 Act exempts both municipal issuers and underwriters, any exemption for municipal issuers under § 10(b) of the 1934 Act necessarily extends to underwriters. The underwriters cannot claim a "derivative immunity" such as that afforded underwriters under § 12(2) of the 1933 Act. It is true that the Congressional protection afforded governmental issuers under § 12(2) similarly shields underwriters from liability for negligent misrepresentations or omissions. However, § 12(2) exhibits nothing more than a Congressional intent not to impose the disclosure burden of § 5 of the 1933 Act on governmental issuers, and not to shift that responsibility to the underwriters of governmental obligations. By contrast, in § 10(b) of the 1934 Act, Congress clearly intended to differentiate between the governmental issuer on the one hand, and underwriters and sellers on the other. Although the debate on the 1934 Act reveals no evidence of a Congressional concern with fraud on the part of governmental issuers, the same cannot be said of Congress' attitude toward others doing business in municipal securities. As observed earlier in the discussion of the scope of § 10(b), Commissioner Landis testified before Congress that some sellers of municipal bonds had defrauded the investing public. House Hearings *supra*, at 897.[28] Congress's decision to subject underwriters and sellers of municipal securities to civil liability under § 10(b) for their own fraudulent conduct understandably followed.

■ Next, it has been argued that Congress, by redefining "person" to include a municipality in the 1975 Amendments to 1934 Acts, merely made explicit what had all along been the case. The legislative history, however, compels the opposite conclusion.[29] Although Congress sought to establish a regulatory scheme for the municipal securities *market* by the adoption of the 1975 amendments,[30] what Commissioner Landis referred to as "obvious political reasons" again led Congress to regulate municipal securities dealers but to exempt the municipalities themselves. Concern that "even if regulation were limited to dealers, it would inevitably have consequences for

any omission to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser.

This section does no more than provide a basis for criminal prosecution and SEC injunctive proceedings. *See* discussion of § 17(a) *infra*. The constitutionality of SEC enforcement actions against municipal issuers pursuant to this section has not yet been conclusively established. *See City of Philadelphia v. SEC*, 434 F.Supp. 281 (E.D.Pa.1977), *appeal dismissed for want of jurisdiction*, 434 U.S. 1003, 98 S.Ct. 707, 54 L.Ed.2d 746 (1978).

27. *See* note 10, *supra.*

28. *See* text accompanying notes 8 to 17 *supra.*

29. The legislative history of the 1975 Amendments does not reveal what was on the minds of legislators in 1934. At best, it is evidence of what the 1975 Congress understood about the operation of the 1934 Act.

30. The 1975 Amendments added, among other things, provisions for the establishment of the Municipal Securities Rulemaking Board, a regulatory mechanism for dealers in municipal securities. *See* § 15B of the 1934 Act, 15 U.S.C. § 78o–4.

issuers." [31] prompted the adoption of the Tower Amendments. These amendments attempted to limit the "collateral effect" of the 1975 Amendments [32] on issuers in the following way:

(d)(1) Neither the Commission nor the Board is authorized under this chapter, by rule or regulation, to require any issuer of municipal securities, directly or indirectly through a purchaser or prospective purchaser of securities from the issuer, to file with the Commission or the Board prior to the sale of such securities by the issuer any application, report, or document in connection with the issuance, sale, or distribution of such securities.

(2) The Board is not authorized under this chapter to require any issuer of municipal securities, directly or indirectly through a municipal securities broker or municipal securities dealer or otherwise, to furnish to the Board or to a purchaser or a prospective purchaser of such securities any application, report, document, or information with respect to such issuer

. . ..

15 U.S.C. § 78o–4(d). The aim of the Tower Amendments was to insure that the 1934 Act (as amended) would not "tamper in any way with prerogatives of state and local governments in their sale of securities." 121 Cong.Rec. 6188 (1975) (remarks of Senator Williams). Thus, in 1975 Congress merely ratified the approach taken in 1934 with respect to municipal securities. It chose, again, for possibly "obvious political reasons," to exempt municipalities themselves from regulation while subjecting others in the municipal securities market to the Act's regulatory scheme.

The legislative history of the 1975 Amendments to the Exchange Act is not silent on the question of the applicability of the antifraud provisions of the securities laws to municipal securities.[33] However, as the following comment from the Senate Report indicates, the record is somewhat ambiguous:

The Committee is mindful of the historical relationship between the federal securities laws and issuers of municipal securities. Apart from the general antifraud provisions, municipal securities are exempt from all substantive requirements.

S.Rep.No.94–75 at 44, U.S.Code Cong. & Admin.News 1975, p. 221. *See also id.* at

---

**31.** Doty & Petersen, *The Federal Securities Laws and Transactions in Municipal Securities*, 71 N.W.U.L.Rev. 283, 345 (1976) (hereinafter *"Transactions in Municipal Securities"*).

**32.** S.Rep.No.94–75, 94th Cong., 1st Sess. 44 (1975), *reprinted in* [1975] U.S.Code Cong. & Admin.News, pp. 179, 222.

**33.** Many commentators, including those relied upon by the movants, have concluded that the 1975 Amendments subject municipal issuers to antifraud liability under § 10(b) for the first time. *See* Schwartz, *Municipal Bonds and the Securities Laws: Do Investors Have An Implied Private Remedy*, 7 Securities Regulation Law Journal 119 (1979); Note, *Federal Securities Fraud Liability and Municipal Issuers: Implication of National League of Cities v. Usery*, 77 Colum.L.Rev. 1064 (1977); Doty & Petersen, *Transactions in Municipal Securities, supra.*

In 1976 Senator Williams introduced S. 2969 to resolve the issue of civil liability of municipal issuers and underwriters. In his testimony on that bill, Professor Doty offered the following explanation of the effect (and purpose) of the 1975 Amendments:

It is important to realize that Rule 10b–5 became explicitly applicable to municipal securities issuers only last year. The Securities Acts Amendments of 1975 added to the definition of "person" a "government, or political subdivision, agency, or instrumentality of a government." This definition is incorporated into Rule 10b–5 by Commission Rule 0–1(b). The Commission evidently takes the position that this amendment was only for clarifying purposes, since it was ignored in Securities Exchange Act Release No. 11876 (November 26, 1975), in which the Commission referred to past applicability of Rule 10b–5.

This position may or may not be accurate. The Committee Report on S. 249 mentions the change as an amendment, but does not say it is only for clarification. S.Rep.No.75, 94th Cong., 1st Sess. 90 (1975). For years, the definition of "person" included "corporations," but said nothing of "municipal corporations." This is significant. As indicated below in the discussion of sovereign immunity issues, the Supreme Court has required specific reference to state and local governments before holding them subject to other legislation.

*Hearings Before the Subcommittee on Securities of the Senate Committee on Banking, Housing and Urban Affairs on S. 2969 and S. 2574*, 94th Cong., 2d Sess. 311 (1976).

45.[34] First, this statement merely confirms that § 10(b) was intended to cover transactions in municipal securities. Second, as discussed *infra*, this statement accurately reflects the fact that § 17(a) expressly subjected municipal issuers to the injunctive and criminal provisions of the 1933 Act. *See Proposed Amendments to the Securities Exchange Act of 1934: Hearings on S. 249 Before the Subcommittee on Securities of the Senate Committee on Banking, Housing and Urban Affairs*, 94th Cong., 1st Sess. 476–79 (1975). Whatever effect the 1975 Amendments may have had on the amenability of governmental issuers to civil liability under § 10(b) in future lawsuits,[35] nothing in the legislative history of those Amendments indicates that prior to their enactment § 10(b) was meant to give rise to a private cause of action against a governmental issuer.

Contrary to the plaintiffs' contention, the Second Circuit in *Forman v. Community Services, Inc.*, 500 F.2d 1246 (2d Cir. 1974), *rev'd on other grounds sub nom. United Housing Foundation v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) did not have before it the question presented here. In *Forman*, the plaintiffs, purchasers of shares in a New York State financed cooperative apartment, brought suit against several corporate defendants under § 10(b) of the 1934 Act and § 17(a) of the 1933 Act. Significantly, the plaintiffs also sought to recover damages from the New York State Housing Finance Agency and the State of New York alleging violations of 42 U.S.C. § 1983 arising out of the same conduct which gave rise to the § 10(b) claims asserted against the other defendants. Thus, the *Forman* court had no occasion to consider whether § 10(b) applied directly to governmental issuers.[36]

While *Forman* did not have the question before it, courts that have considered whether § 10(b) extends to municipalities agree that it does not. Decisions in the Second Circuit and in this district have acknowledged the fact that the definition of "person" in § 3(a)(9) of the 1934 Act did not include municipalities. In *Monell v. Department of Social Services of the City of New York*, 532 F.2d 259 (2d Cir. 1976), *rev'd on other grounds*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) the court, in a footnote, observed:

[T]he definition of "person" in § 3(a)(9) of the Securities Exchange Act of 1934 did not include governmental agencies until the 1975 amendments of § 3(a)(9) . . .

---

**34.** A year after the passage of the 1975 Amendments there was still debate over whether those amendments did anything other than clarify the SEC's authority to investigate municipal issuers. *See Hearings Before the Subcommittee on Consumer Protection and Finance of the House of Representatives Committee on Interstate and Foreign Commerce on H.R. 15205, H.R. 10523, H.R. 10530, H.R. 10606 and H.R. 11534*, 94th Cong., 2d Sess. 26 (1976) (Statement of SEC Commissioner Philip A. Loomis, Jr.); *Hearings Before the Subcommittee on Securities of the Senate Committee on Banking, Housing and Urban Affairs on S. 2969 and S. 2574*, 94th Cong., 2d Sess. 18, 23–23 (1976) (Statement of SEC Chairman Hills). *See also* note 33, *supra*. *Cf.* SEC Release No. 34–11876 (November 26, 1975).

**35.** This court also need not decide whether the 1975 Amendments to § 3(a)(9) of the 1934 Act reflect a Congressional intent to subject state and local governments to federal securities regulation. *Cf. Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Employ-*

*ees v. Department of Public Health & Welfare*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973). *See* Testimony of Professor Doty, note 34, *supra*.

**36.** The *Forman* court did, however, reject the State's attempt to interpose the doctrine of sovereign immunity as a bar to a claim against it arising out of the sale of securities. 500 F.2d at 1256. The court supports its conclusion that New York State had waived its sovereign immunity by referring to the legislative history of the 1933 Act. 500 F.2d at 1257. The section referred to by the court, H.R.Rep.No.85, 73d Cong., 1st Sess. 11 (1934), merely noted that the term "person" in the 1933 Act is broad enough to embrace states and local governments and their instrumentalities. That section of the House Report has nothing whatsoever to do with the civil liability provisions of the 1933 Act, which expressly exclude governmental issuers. It was undoubtedly selected by the *Forman* court only to bolster its argument that, for certain purposes, Congress intended the regulatory scheme to include governmental issuers.

532 F.2d at 263 n.3. Two recent district courts expressed the same view.[37] In *Greenspan v. Crosbie* [1976–1977 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,780 (S.D. N.Y.1976), the court dismissed a lawsuit brought under § 10(b) by the sellers and purchasers of the stock of a Canadian company against the Province of Newfoundland and Labrador, and the three highest officials of that province. While a suggestion of immunity filed by the State Department removed the individual defendants, the court dismissed the government defendants for lack of subject matter jurisdiction. After explaining that governments were not "persons" within the meaning of § 3(a)(9), the court observed:

> . . . it is clear that Congress intended to exclude governments from its definition of "persons" in the 1934 Act. It is significant that the earlier Securities Act of 1933 defines 'person' as '. . . a government or political subdivision thereof.' 15 U.S.C. § 77b(2). The definition in the 1934 Act virtually parallels the language, with the important exception that governments are excluded. Congress obviously intended to exclude governments from liability for violation of the 1934 Act.

*Id.* at 90,827. According to the *Greenspan* court, the language of § 3(a)(9) is "clear and unambiguous" in not covering governments. Any other interpretation of § 3(a)(9) would contradict its plain meaning.

An identical interpretation of § 3(a)(9) was reached in *In re Equity Funding Corp. of America Securities Litigation,* 416 F.Supp. 161, 198 (C.D.Cal.1976). There the plaintiffs asserted claims under § 10(b) against the states of California and Illinois and various state administrative agencies and officials. Those defendants were charged with aiding and abetting other de-

fendants in the commission of securities fraud. After reaching the conclusion that the definition of person in § 3(a)(9) did not include states or their agencies, the court explained:

> It could hardly be argued that 'aider and abettor' liability can be imposed under § 10(b) on entities not within the scope of principal liability under the statute, because not 'persons' under § 3(a)(9).

*Id.* at 198. The view of the *Equity Funding* court is unexceptionable. The decisions in *Greenspan* and *Equity Funding,* as well as the court's reading of § 3(a)(9) in *Monell,* are in agreement with this court's view that the draftsmen of § 3(a)(9) did not intend to include governments—municipal, state, federal or foreign—within the definition of "person."

Finally, this court need not decide whether the 1975 Amendments had the effect of subjecting municipalities to the civil liability provisions of the 1934 Act. In fact, testimony before Congress a year later suggests that the 1975 Amendments were intended to resolve any question as to the SEC's authority to act with respect to governmental issuers. *Cf. City of Philadelphia v. SEC, supra.* It is significant that the same Congress that adopted the 1975 Amendments, one year later was unable to adopt—or even report out of committee—a bill that would have provided for express civil liability in connection with municipal securities. *See Municipal Securities Full Disclosure Act of 1976: Hearings Before the House of Representatives Subcommittee on Consumer Protection and Finance, supra.* Congress apparently felt that grave political and constitutional consequences flowed from subjecting the day-to-day conduct of municipal officials to the scrutiny of the federal securities laws. For example, exposing the mayor of a city to strict antifraud liability under § 10(b) for otherwise

---

**37.** Earlier decisions holding that § 10(b) applied to transactions in municipal securities did not consider whether § 3(a)(9) included state or local governments. For example, neither *Baron v. Shields, supra,* nor *Thiele v. Shields, su-*

*pra,* even recites the definition of "person" in § 3(a)(9). Those cases cannot be said to have settled the meaning of "person" for § 10(b) purposes. Moreover, in *Thiele,* the governmental issuer was not a named defendant.

general remarks made during an after-dinner speech to constituents would be highly questionable, and would fundamentally alter the relationship between elected officials and the electorate. In my opinion, interjection of the federal securities laws into clearly political affairs of local government would represent an unwarranted intrusion into the political life of the community.

■ Given the foregoing, the City of New York cannot be held liable under § 10(b) of the 1934 Act either as a principal or as an aider and abettor, and the complaints against it, to the extent they are based on § 10(b), are dismissed. Finally, since the complaints allege that Mayor Beame and Comptroller Goldin acted solely within their official capacities,[38] they cannot be held individually liable under § 10(b), and the complaints as to them are dismissed.

### III. § 17(a) Claim Against the City of New York

The plaintiffs argue that, even if § 10(b) does not apply to a municipality, a private cause of action against the City exists under § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a). To resolve this question, one must examine the statutory framework of the 1933 Act, the legislative history of § 17(a), and the relevant case law. *See Cannon, supra,* and *Reddington, supra.* On the basis of an analysis of those sources, I conclude that the plaintiffs' complaint against the City under § 17(a) must also be dismissed.[39]

■ Section 17(a) of the 1933 Act must be viewed together with the express civil liability provisions of § 11 and § 12(2) of the same Act. Section 11 deals only with noncompliance or faulty compliance with the registration and prospectus requirements of § 5. By contrast, § 12(2) of the 1933 Act, which expressly excludes exempted securities from its coverage, specifically provides a private remedy to a defrauded investor. Given the interrelationship of these sections, Congress probably did not intend § 17(a) to furnish defrauded investors with a further basis for asserting civil liability. *See* Douglas & Bates, *Federal Securities Act,* 43 Yale L.J. 171 (1934) ("Section 17 probably does not enlarge civil remedies of purchasers . . . since Section 11 and 12 expressly state the remedies which are available"); 3 Loss, *Securities Regulation* 1785 (2d ed. 1966); Jennings & Marsh, *Securities Regulation* 863 (4th ed. 1977).

This interpretation of the structure of the 1933 Act, and the role of § 17(a) in that framework, is supported by its legislative history. First, the House Report on the 1933 Act clearly states under the heading, "Civil Liabilities" that "sections 11 and 12 create and define the civil liabilities imposed by the act and the machinery for their enforcement which renders them practically valuable." H.R.Rep.No.85, 73d Cong., 1st Sess. 9 (1933). Nowhere in that discussion is § 17(a) mentioned. Second, § 17(a) appears to have been intended for a wholly different function, explained by one leading commentator as follows:

> "[A] reading of [§ 17(a)] in light of the entire Act leaves no doubt but that violations of its provisions give rise only to a liability to be restrained by injunctive action or, if willfully done, to a liability to be punished criminally."

Landis, *Liability Sections of Securities Act,* 18 American Accountant, 330, 331 (1933). The same view was expressed by Judge Friendly in *SEC v. Texas Gulf & Sulphur Co.,* 401 F.2d 833, 867 (2d Cir. 1968), *cert. denied sub nom. Coates v. SEC,* 394 U.S.

---

**38.** The allegations in these complaints do not suggest that either of these individual defendants "acted either outside the scope of his respective office, or, if within the scope, acted in an arbitrary manner, grossly abusing the lawful power of his office." *Scheuer v. Rhodes,* 416

U.S. 232, 235, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

**39.** The text of § 17(a) of the 1933 Act is set forth in note 26, *supra.*

976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969) (Friendly, J. concurring), where he observed that there was "unanimity among the commentators" that § 17(a) of the 1933 Act "was intended only to afford a basis for injunctive relief and, on a proper showing, for criminal liability . . .." While the SEC has expressed the view that § 17(a) grants it the authority to investigate municipal issuers, *see* SEC Release No. 34–11876 (November 26, 1975); *see generally* note 34, *supra* and accompanying text, neither the legislative history nor the statutory language of § 17(a) supports the implication of a private cause of action with respect to municipal issuers.

Plaintiffs urge that *Kirshner v. U. S.*, 603 F.2d 234 (2d Cir. 1978), *rehearing denied*, No. 77–6104 (2d Cir. July 18, 1979), *cert. denied sub nom. Goldberg v. Kirshner*, 444 U.S. 995, 100 S.Ct. 531, 62 L.Ed.2d 426 (1979) has established a "naked § 17(a)" cause of action. *See Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028 (2d Cir. 1979), *as amended*, No. 79–7150 (2d Cir. January 14, 1980). In *Kirshner*, the Court of Appeals for the Second Circuit recently held that the plaintiff, a beneficiary of a pension fund, could sue the trustees of that fund under both § 10(b) and § 17(a). In upholding the § 17(a) claim, the court noted that "there [is] little practical point in denying the existence of an action under § 17(a) once it is established that an aggrieved buyer has a private action under § 10(b) of the 1934

Act." *Id.* at 241, *citing SEC v. Texas Gulf Sulphur Co., supra*, at 867 (Friendly, J. concurring). However, since as I perceive it, Congress did *not* intend to confer a private cause of action under § 10(b) against a municipal issuer, *see supra*, notes 24 to 35 and accompanying text, Congress certainly did not intend to provide such a remedy under § 17(a) alone. Consequently, I deem it inappropriate to imply a private cause of action against municipal issuers under § 17(a).[40]

The question being elsewhere undecided, and now squarely presented, I conclude for the reasons stated above that a private right of action against municipal issuers does not exist under § 17(a) of the 1933 Act, and the plaintiffs' claims against the City and its officials based thereon are dismissed.

## IV. The Pendent State Law Claims

Notwithstanding that the plaintiffs' federal securities law claims against the City defendants must fall, the question remains as to whether there is pendent jurisdiction over the city defendants with respect to the plaintiffs' common law fraud claims. This raises the "subtle and complex" issue presented in *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1975), of "whether the doctrine of pendent jurisdiction extends to confer jurisdiction over a party as to whom no independent basis of federal jurisdiction exists."

---

**40.** The City defendants strenuously argue, in the alternative, that, even if § 10(b) applies to municipalities, the tenth amendment, U.S. Const. amend. X, would render that section unconstitutional as applied to the City. *See National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). *See generally* Note, *Federal Securities Fraud Liability and Municipal Issuers: Implications of National League of Cities v. Usery*, 77 Colum.L. Rev. 1064 (1977). *Compare Amersbach v. City of Cleveland*, 598 F.2d 1033 (6th Cir. 1979) *with Friends of the Earth v. Carey*, 552 F.2d 25 (2d Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977); *California v. Blumenthal*, 457 F.Supp. 1309 (E.D.Cal.1978); *Colorado v. Veterans Administration*, 430 F.Supp. 551

(D.Colo.1977), *aff'd*, 602 F.2d 906 (10th Cir. 1979). This raises the difficult issue of whether it would be unconstitutional to limit the prerogatives of municipal officers by subjecting them to liability under § 10(b) with respect to statements made to the general public during a time of crisis. This court need not decide these constitutional questions since a statutory interpretation of § 10(b) requires dismissal of this action against the City defendants.

**41.** In *Aldinger*, the Supreme Court followed *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) which held that local governments were not "persons" subject to suit under § 1983. However, *Monroe v. Pape* was subsequently overruled by *Monell v. New*

*Id.* at 2–3, 96 S.Ct. at 2415. I conclude that this court lacks the power in this case to adjudicate state law claims against a party not otherwise subject to federal jurisdiction.

In *Aldinger,* the plaintiff commenced an action in federal court against Spokane County and various county officials. In addition to a cause of action under Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, the complaint alleged common law tort claims. The court held that since the county was not subject to suit under 42 U.S.C. § 1983, the state law claims would have to be dismissed as well.[41] The court pointed out that the scope of the federal courts' subject matter jurisdiction are defined not only by the language of Article III of the Constitution, but by the "deductions which may be drawn from congressional statutes as to whether Congress wanted to grant this sort of jurisdiction to federal courts." *Id.* at 17, 96 S.Ct. at 2421. Thus, great emphasis was placed on the fact that Congress had excluded counties from liability under § 1983 by not including them in the statute's definition of "persons":

> Parties such as counties, whom Congress excluded from liability in § 1983, and thereby by reference in the grant of jurisdiction under § 1343(3), can argue with a great deal of force that the scope of that "civil action" over which the district

courts have been given statutory jurisdiction should not be so broadly read as to bring them back within that power merely because the facts also give rise to an ordinary civil action against them under state law.

*Id.* In furtherance of this legislative intent, the Court concluded that the plaintiffs' state law claims against the county could not be joined with its federal claims against other parties.[42] In essence, the Court held that pendent jurisdiction could not be used to bring local governments back into the very cases from which the substantive legislation had excluded them.

■■■ This analysis is obviously applicable here. As discussed earlier, Congress excluded cities from the scope of § 10(b) of the Exchange Act and Rule 10b–5. Section 27 of the 1934 Act confers jurisdiction over "actions at law brought to enforce liability or duty created by this chapter or the rules and regulations thereunder." 15 U.S.C. § 78aa. The exclusion of cities from liability under the substantive provisions of the Act evidences a Congressional intent to withhold federal court jurisdiction over actions for securities fraud under state law. I deem it inappropriate, given the principles of *Aldinger,* to hold the City defendants on a pendent jurisdiction theory in the very actions from which Congress has excluded

---

*York Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Monell,* after reexamining the legislative history of § 1983, the Court concluded that Congress had intended to subject municipalities to suit under certain circumstances. This conclusion undermines the holding of *Aldinger* to the extent that municipalities are no longer wholly immune from suit under § 1983. Nevertheless, the validity of the holding in *Aldinger* as to pendent party jurisdiction remains intact. As the court stated in *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978), "*Monell* in no way qualifies the holding of *Aldinger* that the jurisdictional questions presented in a case such as this one are statutory as well as constitutional . . . ." *Id.* at 372 n. 12, 98 S.Ct. at 2402.

**42.** The underwriter defendants rely on *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), in which the Supreme Court sanctioned the joinder of state and federal law claims when such are asserted

against the same defendant. In *Aldinger* the Supreme Court made it very clear that the alignment of parties and claims before it, which are analogous to those in this case, was entirely different from that presented in *Gibbs*:

> From a purely factual point of view, it is one thing to authorize two parties, already present in federal court by virtue of a case over which the court has jurisdiction, to litigate in addition to their federal claim a state-law claim over which there is no independent basis of federal jurisdiction. But it is quite another thing to permit a plaintiff, who has asserted a claim against one defendant with respect to which there is federal jurisdiction, to implead an entirely different defendant on the basis of a state-law claim over which there is no independent basis of federal jurisdiction, simply because his claim against the first defendant and his claim against the second defendant "derive from a common nucleus of operative fact."

427 U.S. at 14, 96 S.Ct. at 2420.

them.[43]  Plaintiffs' state law claims against the City defendants are therefore dismissed.

*Conclusion*

The motions to dismiss by the underwriter and seller defendants are denied, and the motion to dismiss by the City of New York and its former Mayor and Comptroller is granted.

So ordered.

**43.** The underwriter defendants argue that the court should take into account the fact that the City defendants may be brought back into the case anyway on third-party claims for indemnity or contribution. *See Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 376, 98 S.Ct. 2396, 2404, 57 L.Ed.2d 274 (1978). There are several obstacles to such impleader. First, indemnification is not available for underwriters in a securities fraud case. *Stratton Group, Ltd. v. Sprayregen,* 466 F.Supp. 1180, 1185 n. 4 (S.D.N.Y.1979), *citing Globus v. Law Research Services, Inc.,* 418 F.2d 1276, 1288 (2d Cir.), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). Second, the underwriter defendants cannot seek contribution from the City defendants on the plaintiffs' federal securities fraud claims. This is because contribution may only be required of a joint tort-feasor, and the City defendants are not subject to liability under the antifraud provisions of the federal securities laws. *Id.* at 1185 n. 6, 1186 n. 7.

Impleader of the City defendants could only be based on a cause of action for contribution as to the plaintiff's state law claims against the underwriter defendants. However, even on that theory, impleader of the City defendants might be precluded. Under *Aldinger,* "the posture in which the nonfederal claim is asserted and . . . the specific statute that confers jurisdiction over the federal claim" would have to be considered "to determine whether 'Congress in [that statute] has . . . expressly or by implication negated' the exercise of jurisdiction over the particular nonfederal claim. *Aldinger v. Howard, supra,* at 18 [, 96 S.Ct., at 2422]." *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. at 373, 98 S.Ct. at 2402. Even if the third party claim falls within the statutory jurisdiction of this court, the question would remain whether pendent party jurisdiction over the City should be retained as a matter of discretion. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966).