694 F.Supp. 1069 (1988)
In re CITISOURCE, INC. SECURITIES LITIGATION.
D.H. BLAIR & CO., INC., Defendant Third-Party Plaintiff,
v.
CITY OF NEW YORK, Third-Party Defendant.
D.H. BLAIR & CO., INC., Defendant Third-Party Plaintiff,
v.
HOLTZMANN, WISE & SHEPARD
and
David Berdon & Co., Third-Party Defendants.
No. 86 Civ. 1711 (GLG).
United States District Court, S.D. New York.
September 12, 1988.
*1070 *1071 Wilmer, Cutler & Pickering, Washington, D.C. (Gerard S. Citera, Arthur F. Mathews, Andrew B. Weissman, Maxwell O. Chibundu, Stephen H. Sachs, of counsel), Gusrae, Kaplan & Bruno, New York City (Martin Kaplan, Thomas Rigilano, of counsel), for defendant third-party plaintiff, D.H. Blair & Co., Inc.
Peter L. Zimroth, Corp. Counsel, New York City (Helene Fromm, Allen E. Burns, Steven Levi, of counsel), for third-party defendant, City of New York.
Lester Schwab Katz & Dwyer, New York City (Richard Granofsky, Steve Getzoff, of counsel), for third-party defendants, Holtzmann, Wise & Shepard.

OPINION
GOETTEL, District Judge:
Familiarity with the facts underlying this case is presumed; they have been well publicized, and were described in the Second Circuit's opinion in United States v. Friedman, 854 F.2d 535 (1988). As that description makes clear, the investigation which bared New York City's maggoted Parking Violations Bureau[1] (the "PVB") revealed as well the infestation of CitiSource, Inc. and the rot of the foundation on which that company was built. The value of CitiSource's stock rested primarily, if not solely, on the company's $22.7 million-dollar contract with New York City ("NYC") to provide hand-held computers which would issue parking tickets and otherwise assist enforcement of NYC's parking restrictions ("the contract"). That contract, and with it the value of CitiSource's stock, evaporated in January 1986, when the government's investigation of CitiSource became public and NYC canceled the contract.
It comes as no surprise, then, that certain of CitiSource's shareholders have filed a putative class action (the "Consolidated Complaint") naming as defendants CitiSource, its officers and directors, Geoffrey Lindenauer, and D.H. Blair & Co., Inc. ("Blair"). Blair acted as the sole underwriter of the initial public offering of CitiSource's stock, and the Consolidated Complaint alleges that in this position Blair violated section 11 of the Securities Act, 15 U.S.C. § 77k; section 12(2) of the Securities Act, 15 U.S.C. § 77l(2); section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and the common law (fraud).[2]
The gravamen of the plaintiffs' claims against Blair is that Blair either knew or recklessly disregarded facts which did cause or should have caused it to know that the CitiSource prospectus, and certain Form 10-K's and 10-Q's filed by CitiSource after its initial public offering, contained misrepresentations and omissions of material facts. These misrepresentations and omissions concerned, inter alia, the involvement of bribery, extortion and pretense in the award of the contract to CitiSource; the reasons underlying NYC's broad rights of termination under the contract;[3] the degree to which CitiSource had *1072 (not) developed the technology for the computer, and a prototype thereof; and the identities of the principal shareholders of the company.
Blair, in turn, has filed third-party complaints against NYC, and against Holtzmann, Wise & Shepard, which acted as special counsel to CitiSource in connection with the issuance and sale of its stock to Blair and to the public. Each of these third-party defendants has moved, separately, to dismiss the third-party complaints against them.

NEW YORK CITY
Blair's action against NYC is premised on the actions of Geoffrey Lindenauer, Lester Shafran, the late Donald Manes, and Michael Zapantis (the "subject employees"). Blair alleges that at all pertinent times: NYC employed Lindenauer as the Assistant Commissioner of the DOT and the Deputy Director of the PVB; NYC employed Shafran as a Deputy Commissioner of the DOT and the Director of the PVB; Manes was the Borough President of Queens County, the Queens Democratic leader, and a member of NYC's Board of Estimate; and NYC employed Zapantis as special counsel to the PVB. According to its third-party complaint, these individuals made several misrepresentations and omissions of material fact to Blair, in their official capacities. These misrepresentations and omissions related to, inter alia: the bribery and extortion involved in obtaining the contract; the degree to which NYC's contract approval procedures allowed and indeed fostered corruption; the manner in which these procedures had been abused in securing the contract; the identity of the principals of CitiSource and their relationships with NYC; the probability that the contract would be cancelled; and inaccuracies contained in correspondence from CitiSource to the SEC. Unlike the other subject employees, Zapantis is alleged to have acted only negligently or recklessly, and not intentionally.
Based on these allegations, Blair's third-party complaint seeks to impose liability on NYC under a variety of theories. The first and third causes of action seek to recover for alleged violations of section 10(b) and Rule 10b-5. (The first cause of action is styled as a claim for contribution, and the third cause of action alleges that Blair is entitled to recover from NYC for the subject employees' alleged violations of section 10(b) and Rule 10b-5 under principles of respondeat superior.) The second cause of action seeks contribution for violations of the common law (fraud and negligent misrepresentation) by the subject employees. The fourth and fifth causes of action are framed as RICO claims under 18 U.S.C. § 1962(c) and (d), the fifth being styled as based upon principles of respondeat superior. The sixth cause of action alleges negligence in supervision and control. The third-party complaint also alleges that NYC is responsible under principles of respondeat superior for the negligent, fraudulent, and tortious activity of the subject employees.
New York has moved (a) to dismiss the third-party complaint pursuant to Fed.R. Civ.P. 12(b)(6), 14, and 9(b); (b) alternatively, to sever and stay Blair's action against it, pursuant to Fed.R.Civ.P. 14, pending the final disposition of the related consolidated stockholders' class action; and (c) for costs and disbursements of this motion.

I. Claims Sounding in Fraud

a. Whether section 10(b) and Rule 10b-5 apply to municipalities

NYC's first attack on the third-party complaint is its argument that as a municipality, it is not an entity to which the anti-fraud provisions of either section 10(b) or Rule 10b-5 apply. We disagree, for the following reasons.
Section 10(b) provides that "[i]t shall be unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance...."[4] *1073 (emphasis added) Until 1975, the term "person," as defined in section 3(a)(9) of the Exchange Act, 15 U.S.C. § 78c(a)(9), had been construed as excluding municipalities. In re New York City Municipal Securities Litigation, 507 F.Supp. 169, 184-85 (S.D.N. Y.1980) (listing cases). This construction of course had the consequence that section 10(b), and Rule 10b-5 promulgated thereunder, were inapplicable to municipalities.[5] However, in 1975, the 94th Congress enacted the Securities Acts Amendments of 1975, Pub.L. No. 94-29, 89 Stat. 97 (1975), which amended the Exchange Act in several respects. As part of this legislation, the definition of "person" in section 3(a)(9) was amended to include a "government, or political subdivision, agency, or instrumentality of a government." At issue before us is whether by this amendment, municipalities were made subject to the anti-fraud provisions of section 10(b) and Rule 10b-5.
NYC seems to suggest that despite the well established existence in 1975 of an implied private right of action under section 10(b) and Rule 10b-5, of which Congress may be presumed to have been aware, Congress did not mean by including municipalities within the definition of person to subject them to section 10(b) liability. However, possibly because of the holding in In re Washington Public Power Supply System Securities Litigation, 623 F.Supp. 1466, 1478-1480 (W.D.Wa.1985), aff'd, 823 F.2d 1349 (9th Cir.1987), NYC does not strongly press this argument. Rather, its primary argument is that even if Congress did intend to subject municipalities to liability under the anti-fraud provisions of the Exchange Act, it so intended only insofar as municipalities acted in the capacity of issuers of securities.
With limited exceptions, we should not look beyond the express language of a statute in search of Congressional intent. We may do so only if the words of the statute are ambiguous, or if a literal reading of the statute would thwart the purpose of the statutory scheme or lead to an absurd result. See United States v. Public Utilities Commission of California, 345 U.S. 295, 315, 73 S.Ct. 706, 717, 97 L.Ed. 1020 reh'g denied, 345 U.S. 961, 73 S.Ct. 935, 97 L.Ed. 1380 (1953); United States v. American Trucking Associations, Inc., 310 U.S. 534, 543-44, 60 S.Ct. 1059, 1063-64, 84 L.Ed. 1345 reh'g denied, 311 U.S. 724, 61 S.Ct. 53, 85 L.Ed. 472 (1940). NYC does not argue that the words of the statute are ambiguous, and indeed they could not be clearer. They state that "[t]he term `person' means a natural person, company, government, or political subdivision, agency or instrumentality of a government." This language contains no limitation; it contains nothing to indicate that "person" means a municipality only when that municipality is performing certain functions rather than others.[6]
With regard to the second circumstance in which we may look beyond the express language of a statute, we note that NYC does not argue that a literal reading of the statute would thwart the statutory scheme of which it is a part, or that to do so would lead to an absurd result. Instead, NYC simply argues that there are sound policy reasons for confining section 10(b) liability to non-governmental parties. See, e.g., In re New York City Municipal Securities *1074 Litigation, 507 F.Supp. at 180-85.[7] (We submit that when Congress has already weighed the relevant policy considerations, it is not for this Court to reconsider Congress' judgment.) For the following reasons, we find that a literal reading of section 3(a)(9), whereby section 10(b) liability could be imposed upon non-issuing as well as issuing municipalities, is consonant with the statutory scheme of which section 3(a)(9) is a part.
To begin, the chief object of the 1975 Amendments was not the municipal securities market per se. Indeed, although both the House of Representatives and the Senate reported bills ultimately leading to the enacted legislation, only that emanating from the Senate contained measures addressing the municipal securities industry. Moreover, the Senate's principal interest in the municipal securities market lay not with municipal issuers, but with the professionals trading in that marketthe brokers, dealers, and bankers. See, e.g., S.Rep. No. 94-75, 94th Cong., 1st Sess. 43 (the "Senate Report"), U.S.Code Cong. & Admin.News 1975, p. 179.[8] The Senate's bill reflected the concern of that body that abuses committed by a limited number of these professionals[9] had undermined the public's confidence in the municipal securities market, and thereby threatened municipalities' access to capital. Id.
Although the 1975 Amendments included a response to deficiencies in the law with respect to the municipal securities market, their primary object was to modernize and update the law with respect to securities markets as a whole. The legislation represented a comprehensive response to the fundamental changes which had taken place and which were expected to take place with respect to "the manner in which securities are traded, the role played in the securities markets by institutional investors, the structure of the national and international economy, and the capabilities and availability of communications and data processing equipment." Senate Report at 1; see also H.R.Rep. No. 94-229, 94th Cong., 1st Sess. 91 (the "Conference Report"). Congress sought to address these changes and thereby to improve efficiency, responsiveness and fairness in the operation of the securities markets and to improve investor protection. See, e.g., Senate Report at 2 and 8-9; Conference Report at 92. To this end Congress believed that, among other things, it was necessary to increase the oversight authority of the SEC. Id. A literal reading of section 3(a)(9) such as would impose section 10(b) liability upon non-issuing municipalities appears to be consonant with these purposes.
Nor can such a reading be said to lead to an absurd result. The prospect of liability for fraud is not something new to municipalities, see 18 McQuillin, Municipal Corporations § 53.13 (3d ed. 1977) (and cases cited therein); Charles S. Rhyne, Municipal Law § 30-30 (1957) (and cases cited therein), particularly where the subject public employee is motivated by corruption, see Municipal Corporations, supra, at 147.
*1075 We note that our decision that municipalities are subject to section 10(b) and Rule 10b-5 comports with the principle which favors the broad and flexible construction of securities laws combating fraud and which disfavors "an interpretation of the securities laws that displaces an action under § 10(b)." Herman & MacLean v. Huddleston, 459 U.S. 375, 386-87, 103 S.Ct. 683, 689-90, 74 L.Ed.2d 548 (1983) (quoting SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963)). It comports as well with the trend of judicial decisions which has contracted the doctrine of municipal immunity. See Owen v. City of Independence, 445 U.S. 622, 646 n. 28, 100 S.Ct. 1398, 1413 n. 28, 63 L.Ed.2d 673 reh'g denied, 446 U.S. 993, 100 S.Ct. 2979, 64 L.Ed.2d 850 (1980).[10]

b. Whether the alleged misrepresentations were made "in connection with" the purchase and sale of a security so as to bring them within the purview of section 10(b) and Rule 10b-5

NYC claims that the alleged misrepresentations by NYC employees do not constitute action proscribed by section 10(b) or Rule 10b-5 because they were not made "in connection with" the purchase or sale of a security. NYC reasons that since its employees' alleged misrepresentations and omissions pertain only to the terms of the contract and its procurement, and to CitiSource's affiliate, Data Conversion Corporation,[11] the complaint alleges no misrepresentations or omissions that pertain directly to the CitiSource stock. We disagree.
The phrase "in connection with" means "only that the device employed, ... be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities." Securities and Exchange Comm'n v. Texas Gulf Sulphur Co., 401 F.2d 833, 860 (2d Cir.1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Thus the "in connection with" requirement will be met as long as the plaintiff reasonably relied on the misrepresentation in determining whether to purchase or sell a security.
The most valuable, if not the sole asset of CitiSource was the contract. Consequently, the value of the company, and thus the value of its stock, were directly related to the validity of the contract and the integrity of the process by which it was obtained. It is ludicrous to suggest that misrepresentations and omissions as to the fragility of the foundation of a corporation's value do not constitute misrepresentations which pertain to its stock.

c. Whether Blair has sufficiently alleged "control person" liability under Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), provides that
[e]very person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person *1076 to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
NYC argues that Blair has failed to allege control person liability for two reasons. First, NYC argues that scienter is a necessary element of a claim for section 20(a) liability, and that Blair has failed to plead this element. Second, NYC argues that Blair's failure to assert claims against the subject employees is fatal to its claim against NYC as the person controlling them.

1. The scienter issue
NYC notes that there is a split within this district as to whether scienter is an element of a prima facie case for section 20(a) liability. NYC notes further that we concluded in an earlier opinion in this case that it was not. In Re CitiSource, Inc. Securities Litigation, 86 Civ. 1711 (GLG) (S.D.N.Y. May 15, 1987) (Tr., p. 54). However, the City argues that "it would be appropriate under the unique facts of this case and in light of the culpable participation analysis in Lanza v. Drexel, [479 F.2d 1277, 1299 (2d Cir.1973)], to require Blair to establish scienter for purposes of imposing liability under section 20(a) [against NYC]." We disagree, and affirm our earlier conclusion that section (20)(a) "`makes liability contingent on the status of being a controlling person, subject to the statutory defense.'" In Re CitiSource, Inc. Securities Litigation, supra, Tr. at 54 (quoting Drobbin v. Nicolet Instrument Corp., 631 F.Supp. 860, 886 (S.D.N.Y. 1986)).
It has long been held that once a defendant has been shown to be a controlling person, the burden shifts to that defendant to establish his good faith.[12]See, e.g., Marbury Management, Inc. v. Kohn, 629 F.2d 705, 716 (2d Cir.), cert. denied, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980) (citing Stern v. American Bankshares Corp., 429 F.Supp. 818, 823 (E.D. Wis.1977), where the court held that "[o]nce it is established that the defendant is a controlling person, the burden shifts to the defendant to show that he acted in good faith ..."); DeMarco v. Edens, 390 F.2d 836, 841-42 (2d Cir.1968) ("defendant may exculpate himself from liability [under the analogous provision in section 15 of the Securities Act, 15 U.S.C. § 77o] by fulfilling his burden of proving [good faith]") (emphasis added); Paul F. Newton & Co. v. Texas, 630 F.2d 1111, 1120 (5th Cir.1980); Mader v. Armel, 461 F.2d 1123, 1126 (6th Cir.), cert. denied, 409 U.S. 1023, 93 S.Ct. 465, 34 L.Ed.2d 315 (1972); Terra Resources I v. Burgin, 664 F.Supp. 82, 88 (S.D.N.Y.1987); Savino v. E.F. Hutton & Co., Inc., 507 F.Supp. 1225, 1243 (S.D.N.Y. 1981); Moerman v. Zipco, Inc., 302 F.Supp. 439, 447 (E.D.N.Y.1969), aff'd, 422 F.2d 871 (2d Cir.), decision adhered to, 430 F.2d 362 (2d Cir.1970) (control persons are responsible for the acts of the person liable, simply by virtue of the fact of their control over him, unless they have sustained the burden of proving that they acted in good faith); but see Gordon v. Burr, 506 F.2d 1080, 1085-86 (2d Cir.1974) (suggesting that the plaintiff must make at least some showing of culpability before the burden shifts to the defendant to establish his good faith; note that this case predates Marbury, supra).
In our view, this result is consistent with the precept that section 20(a) was intended to impose section 10(b) liability only on those "who are in some meaningful sense culpable participants in the fraud perpetrated by the controlled persons", Lanza, 479 F.2d at 1299. It is simply that the burden is on the defendant to show that he is not culpable, rather than on the plaintiff to show that the defendant is culpable. *1077 See Terra Resources I, 664 F.Supp. at 88 ("it would seem imprudent to construct a pleading requirement that demands that plaintiffs anticipate and negate an alleged controlling person's good faith defense by pleading detailed facts to show the controller's culpability"); Metge v. Baehler, 577 F.Supp. 810, 816 (S.D.Ia.C.D.1984), aff'd in pertinent part, 762 F.2d 621 (8th Cir.1985), cert. denied, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986) ("Culpability and good faith are two sides of the same issue, and ... [t]o require the plaintiff ... to prove culpability would amount to giving both parties the burden of proof on the same issue."); Barthe v. Rizzo, 384 F.Supp. 1063, 1069 (S.D.N.Y.1974).

2. Blair's failure to assert claims against the subject employees
NYC posits, correctly, that the liability of a control person under section 20(a) is coextensive with that of the controlled person. Therefore, NYC argues, since Blair has failed to assert a claim against either Lindenauer, Shafran, Zapantis, or Manes' estate, it may not maintain a section 20(a) claim against NYC. NYC's argument presents the issue of whether the liability of the primary violator is simply an element of proof of a section 20(a) claim, or whether instead liability must be actually visited upon the primary violator before a controlling person can be liable. Not surprisingly, the cases we have found which address this issue involve a primary violator who is unavailable. See, e.g., Kemmerer v. Weaver, 445 F.2d 76 (7th Cir.1971) (controlled entity, an association, was unavailable because it had been dissolved); Briggs v. Sterner, 529 F.Supp. 1155 (S.D.Ia.1981) (controlled entity, a corporation, was unavailable due to bankruptcy).[13] Although the factual setting of those cases differs somewhat from that of this case, they are nevertheless instructive. As they point out, there is nothing in the language of section 20(a) which compels the joinder of the controlled person, "and nothing in familiar and conceptually related attribution principles such as conspiracy membership, agency, or aider and abettor, demands a visiting of actual liability upon an active wrongdoer as a condition to an attribution of that liability." Keys v. Wolfe, 540 F.Supp. 1054, 1062 (N.D.Tex.D. D.1982), rev'd on other grounds, 709 F.2d 413 (5th Cir.1983); see also Briggs, 529 F.Supp. at 1170-71; Folk, Civil Liabilities Under the Federal Securities Acts, The Bar Chris Case, 55 Va.L.Rev. 99, 217-18 & n. 64 (analogizing to principles of master/servant liability). We agree, and hold that the liability of the primary violator is simply an element of proof of a section 20(a) claim, and that liability need not be actually visited upon the primary violator before a controlling person may be held liable for the primary violator's wrong. Consequently, Blair's failure to assert a claim against either Lindenauer, Shafran, Zapantis, or Manes' estate is not fatal to its claim against NYC under section 20(a).

d. Whether NYC may be liable under respondeat superior for the acts of the subject employees

NYC posits, correctly, that an employer is not liable under principles of respondeat superior for acts of its employees which are outside the scope of their employment. See, e.g., Marbury Management, Inc., 629 F.2d at 716. Therefore, NYC argues, it cannot be liable to Blair under principles of respondeat superior because the acts of the subject employees *1078 were outside the scope of their employment. The problem with NYC's argument is that it does not specify to which acts of these employees it is referring. It seems, however, that NYC is addressing itself to their acts of bribery and extortion, and their defrauding of NYC. But the acts more pertinent here are the employees' misrepresentations and omissions concerning their earlier bribery and extortion. NYC may have an argument that the bribery, et al, was outside the scope of employment, a point which we need not decide, but the employees' acts in misrepresenting to Blair and to the plaintiff class the validity of the contract and the integrity of the process by which it was obtained were well within the scope of their employment, and it does not appear that NYC argues otherwise.
NYC also seems to suggest that it cannot be responsible under respondeat superior because its employees' knowledge cannot be imputed to it since their actions were against its interests. This analysis mixes apples with oranges. Although it has been held that an agent's knowledge will not be imputed to a principal when the interests of the agent are adverse to those of the principal, see, e.g., Mallis v. Bankers Trust Co., 717 F.2d 683, 689 n. 10 (2d Cir.1983), this principle does not shield an employer from liability for the misrepresentations of his employee. It is well established that an employer, whose employee acts with apparent authority, may be held liable for the misrepresentations of his employee, even though the employer received no benefit from the employee's action, even though the employee was acting entirely for his own purposes, and even though the employee was acting against the interests of the principalindeed, even if the employee acted with the purpose of defrauding the employer. E.g., American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp., 456 U.S. 556, 566, 102 S.Ct. 1935, 1942, 72 L.Ed.2d 330 reh'g denied, 458 U.S. 1116, 102 S.Ct. 3502, 73 L.Ed.2d 1379 (1982); Gleason v. Seaboard Air Line Railway Co., 278 U.S. 349, 353-57, 49 S.Ct. 161, 161-62, 73 L.Ed. 415 (1929); Restatement (Second) of Agency §§ 256-265 and § 249 comment a, § 257 comment d, § 261 comment a (1958) (and cases cited in the appendix thereto).

e. Whether NYC may be liable for contribution for the misrepresentations and omissions of the subject employees

NYC seeks to avoid liability for contribution based on the same line of reasoning it offered with respect to respondeat superior liability. It argues that contribution for violations of the federal securities laws may be required only of joint tortfeasors who were knowing participants in the alleged fraud. Therefore, it claims, it cannot be liable to Blair for contribution because the knowledge of its employees cannot be imputed to it since its employees were acting in their own interests and adverse to the interests of NYC. NYC's analysis is incorrect. As long as NYC's employees may be held liable for contribution, then NYC, who under either section 20(a) or respondeat superior may be liable to the same extent as its employees, may itself be liable for contribution.[14] Scienter is relevant to the issue of NYC's liability for contribution only insofar as it bears on the employees' primary liability. As we held above, scienter is not an element of a claim based upon either section 20(a) or respondeat superior.[15]

*1079 II. The RICO Claims
In its fourth cause of action, Blair charges NYC with having violated sections 1962(c) and (d) of RICO. Count five seeks identical relief under principles of respondeat superior. As predicate offenses, Blair refers to various acts by the subject employees involving extortion, mail and wire fraud, bribery, obstruction of justice, and fraud in the sale of securities. The RICO claims suffer from many deficiencies, the most prominent of which are discussed below.
The term "person" as defined by the RICO statute at 18 U.S.C. § 1961(3) is literally broad enough to include municipal corporations. Haroco, Inc. v. American Nat'l Bank and Trust Co. of Chicago, 747 F.2d 384, 386 (7th Cir.1984), aff'd, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985); Cullen v. Margiotta, No. 77-2247 (E.D.N.Y. Aug. 31, 1987) (mem. dec. at 7). But this is only the first hurdle on the track leading to municipal liability under RICO. The second hurdle lies in the fact that a plaintiff alleging a civil RICO violation must prove that the defendant committed a predicate offense set out in 18 U.S.C. § 1961(1). To do so, the plaintiff must prove the intent required to establish the underlying predicate offense. Cf. United States v. Scotto, 641 F.2d 47, 55-56 (2d Cir.1980), cert. denied, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981); United States v. Boylan, 620 F.2d 359, 361-62 (2d Cir.), cert. denied, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980). The issue of intent is the Achilles' heel of the plaintiff seeking to impose RICO liability upon a municipal corporation under 18 U.S. C. § 1962(c). Unlike an ordinary corporation, a municipal corporation is incapable of the criminal intent necessary to support the alleged predicate offenses. Cullen, mem. dec. at 7-8; Massey v. Oklahoma City, 643 F.Supp. 81 (W.D.Okl.1986); see Hunt v. City of Boonville, 65 Mo. 620 (1877) (cited with approval in Newport v. Fact Concerts, Inc., 453 U.S. 247, 261, 101 S.Ct. 2748, 2756, 69 L.Ed.2d 616 (1981)) (noting *1080 "respectable authority" supporting the proposition that municipal corporations "can not, [sic] as such, do a criminal act or a willful and malicious wrong"); 17 E. McQuillin, A Treatise On The Law of Municipal Corporations, § 49.88 (1982); but cf. Anderson-Myers Co. v. Roach, 660 F.Supp. 106, 112-113 (D.Kan.1987) (state official sued in his official capacity held liable under 18 U.S.C. § 1962(c)). This result obtains because the criminal intent of its agents will not be imputed to a municipal corporation, as it would be to an ordinary corporation. Cullen, mem. dec. at 9-10; see Massey, 643 F.Supp. at 85 (although city officials have the capacity to form the mens rea to commit an act of racketeering, the city itself, the body politic, does not).
It is no answer to say that NYC should be held liable under RICO because it may be held vicariously liable for the alleged securities offenses under principles of respondeat superior. Respondeat superior has been rejected as a basis for liability under § 1962(c). See, e.g., Schofield v. First Commodity Corp. of Boston, 793 F.2d 28, 32-34 & n. 3 (1st Cir.1986); Banque Worms v. Luis A. Duque Pena E Hijos, Ltda., 652 F.Supp. 770, 772-73 (S.D. N.Y.1986) (Goettel, J.). The most common reason offered for this rejection is that to permit vicarious liability for violations of § 1962(c) would permit an "end run" around the precept that the individual alleged to be the RICO person cannot contemporaneously also be alleged to be the RICO enterprise.[16] Thus for example the court in Petro-Tech Inc. v. Western Company of North America stated:
"[r]espondeat superior ... would disrupt the intended operation of § 1962(c) by making the § 1962(c) enterprisethe victim ... of the racketeering activityliable. Respondeat superior would have that effect because it renders the employer i.e. the enterpriseresponsible for the acts of the employeesi.e. the persons. Respondeat superior liability under § 1962(c) is therefore foreclosed ... insofar as it would make the enterprise liable for the RICO violations victimized it."
824 F.2d 1349, 1359 (3d Cir.1987);[17]but see United States v. Hartley, 678 F.2d 961, 988-990, reh'g denied, 688 F.2d 852 (11th Cir.1982) (the same entity can be simultaneously both the RICO person and the RICO enterprise).[18]
Moreover, it would be anomalous to hold a municipality vicariously liable under § 1962(c) in light of the fact that, for the reasons discussed above, the municipality could not be held vicariously liable for the commission of the predicate acts themselves. If the municipality cannot be vicariously liable for the predicate acts, it cannot be vicariously liable under a statute such as § 1962(c) which requires reference to those acts.
For all of these reasons, both the fourth and the fifth causes of action must be dismissed.

III. The Negligence Claim
Blair's sixth cause of action alleges that it has been injured as a proximate result of *1081 NYC's negligence in the hiring, supervision, and control of Manes, Lindenauer, Shafran, and Zapantis, and in the supervision, control, and monitoring of the activities of NYC's contract procurement and management program and the activities of the PVB. NYC argues that this claim alleges nothing more than a breach of a duty owed to the general public, namely to safeguard the public from corruption in government, and therefore fails to state a cause of action.
The law of New York governing municipal liability for negligence was succinctly stated by the Court of Appeals in Florence v. Goldberg, 44 N.Y.2d 189, 404 N.Y.S.2d 583, 375 N.E.2d 763 (Ct.App.1978):
"As in the case of an individual or private corporation, ... a municipality's liability must be premised upon the existence and breach of a duty flowing from the municipality to the plaintiff.... Moreover, to sustain liability against a municipality, the duty breached must be more than a duty owing to the general public. There must exist a special relationship between the municipality and the plaintiff, resulting in the creation of `a duty to use due care for the benefit of particular persons or classes of persons'....
....
Where, however, a special relationship exists between a municipality and a plaintiff creating a duty, albeit one normally inuring only to the benefit of the public at large, a municipality may be held liable for ... its negligence.... Moreover, where a municipality assumes a duty to a particular person or class of persons, it must perform that duty in a nonnegligent manner, notwithstanding that absent its voluntary assumption of that duty, none would have otherwise existed."
Id. at 586-87, 375 N.E.2d 766.
It is obvious from Count Six of Blair's third-party complaint, and from that portion of its memorandum addressing Count Six, that Blair's complaint with NYC's supervision and control lies primarily, if not solely with NYC's failure to remedy the bribery and corruption that permeated the PVB, and with NYC's failure to control its procedures governing the awarding of contracts so as to assure that they would be awarded in a fair and honest manner. As NYC argues, a duty to check corruption is a duty owed to the general public. Therefore, in order to recover for a breach of that duty, Blair must allege some special relationship with NYC such as would render NYC liable to Blair for its failure to check corruption. It has not done so.[19]
Moreover, Blair has alleged nothing to indicate how it was damaged by NYC's contract awarding process, or by the bribery and extortion about which it complains. The only damages apparent from the complaint flow not from the bribery and extortion practiced by the subject employees, nor from the contract-awarding process itself, but rather from the subject employees' misrepresentations and omissions as to these issues and as to the consequences of these issues for the validity of the contract. Therefore, insofar as Blair seeks to recover in negligence for NYC's failure to check the bribery and extortion practiced in the PVB, or for NYC's failure to ensure that contracts with it were awarded in a fair and honest manner, Blair has failed to state a cause of action for negligent supervision and control.

IV. NYC's Motion to Sever
We see nothing to NYC's claim that to try this action with the plaintiffs' case would lead to duplication. Indeed, to sever and retry the overlapping issues would clearly lead to duplication. Consequently, the alternative motion to sever is denied.

HOLTZMANN, WISE & SHEPARD
Holtzmann, Wise & Shepard acted as special counsel to CitiSource in connection with the issuance and sale of the common *1082 stock of CitiSource to Blair and to the public.[20] In its third-party complaint, Blair seeks contribution from Holtzmann, Wise for any judgment that the plaintiff class may obtain against Blair, and damages for "independent" claims.[21]
Blair assiduously avoids suggesting that Holtzmann, Wise had actual knowledge of the CitiSource fraud, and acknowledges that it has no basis for doing so. Rather, the gravamen of the Third-Party Complaint is that Holtzmann, Wise was reckless or negligent in failing to discover the CitiSource fraud.
Holtzmann, Wise has moved to dismiss the third-party complaint pursuant to Fed. R.Civ.P. 9(b), 12(b)(6) and 14(a).

I. Section 10(b) and Rule 10b-5
Blair's third cause of action against Holtzmann, Wise seeks contribution based upon alleged violations by Holtzmann, Wise of section 10(b) and Rule 10b-5. Holtzmann, Wise argues that this claim is fatally deficient because it fails to plead scienter with sufficient particularity to satisfy Fed.R.Civ.P. 9(b).
Although under Rule 9(b) the other elements of fraud must be pled with greater particularity, scienter may be averred generally. At a minimum, however, a plaintiff must specifically plead those facts which give rise to a strong inference of scienter. Connecticut National Bank v. Fluor Corp., 808 F.2d 957, 962 (2d Cir.1987).
As we indicated above, Blair does not allege that Holtzmann, Wise actually knew of the CitiSource fraud, but only that it was reckless or negligent in failing to discover it. The Second Circuit has held that recklessness will satisfy the requirement of scienter in a section 10(b) claim. E.g., Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 46 (2d Cir.), cert. denied, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); but see Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668, reh'g denied, 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976) (leaving open the question of whether recklessness will suffice to establish scienter under § 10(b) and Rule 10b-5). Recklessness, for purposes of section 10(b), has been defined as "at the least, conduct which is `highly unreasonable' and which represents `an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" Rolf, 570 F.2d at 47 (quoting Sanders v. John Nuveen & Co., 554 F.2d 790, 793 (7th Cir.1977)).
Blair argues that recklessness can be inferred from the following facts pleaded in its third-party complaint: Holtzmann, Wise drafted the registration statement and prospectus; provided information to Blair in the course of its due diligence investigation; issued two opinion letters which assured Blair that nothing had come to the attention of Holtzmann, Wise to give it reason to believe that the registration statement or the prospectus contained any untrue statement of a material fact or that those documents omitted to state any material fact; participated in numerous meetings and telephone conversations with Blair which concerned matters touching on the offering; and provided information to the Securities Exchange Commission with respect to the registration statement and prospectus. This list of activities tells us nothing more than that in connection with the CitiSource offering, Holtzmann, Wise performed *1083 the functions which customarily attend the position of counsel to an issuer. Thus Blair's argument reduces to the proposition that the mere fact of Holtzmann, Wise's position as special counsel to CitiSource permits a strong inference that it was reckless in failing to discover the fraud perpetrated by the principals of that company.
In support of this proposition, Blair points to several cases which address the liability of counsel to an issuer under the federal securities laws, e.g., Arden Way Assoc. v. Boesky, 664 F.Supp. 855 (S.D.N. Y.1987) (Pollack, J.); Ahern v. Gaussoin, 611 F.Supp. 1465 (D.Or.1985). These cases are not instructive. Although they do involve the subject of the liability of issuers' attorneys for misstatements and omissions, they do not address the issue before us, viz., whether in assessing Holtzmann, Wise's failure to discover the CitiSource fraud, the mere fact of its status as issuer's counsel permits a strong inference of recklessness, i.e., "conduct which is `highly unreasonable' and which represents `an extreme departure from the standards of ordinary care....'" Rolf, 570 F.2d at 47 (upholding the lower court's factual findings as not being clearly erroneous) (quoting John Nuveen & Co., 554 F.2d at 793). We decline to be the first to adopt this novel proposition.
We acknowledge that a certain degree of involvement in the affairs of an issuer and/or its principals might warrant such an inference. But the mere fact of one's status as special counsel does not, by itself, indicate that degree. See Mendelsohn v. Capital Underwriters, Inc., 490 F.Supp. 1069, 1088 (N.D.Cal.1979) (preparation of several documents relating to limited partnership did not, per se, indicate such a degree of involvement from which it could be inferred that attorney knew of, or was recklessly indifferent to, fraud of entity's principal); Vereins-Und Westbank AG v. Carter, 639 F.Supp. 620 (S.D.N.Y.1986) (knowledge of fraud would not be inferred solely from the fact that defendant attorneys prepared the documents containing the allegedly false statements).
For these reasons, the third cause of action is dismissed, with leave to replead if Blair can allege sufficient facts and circumstances from which an inference of scienter can be drawn.

II. Section 12(2)
Blair's failure to sufficiently allege scienter is likewise fatal to its second cause of action, which is for contribution based upon alleged violations by Holtzmann, Wise of section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2).[22]
Liability under section 12(2) is available to the buyer of securities against his immediate seller, and against those who "substantially participated" in the sale. However, when a plaintiff seeks to impose liability upon one who is not his direct seller, the plaintiff must allege and prove scienter. E.g., Akerman v. Oryx Communications, Inc., 810 F.2d 336, 344 (2d Cir.1987). Blair does not allege that Holtzmann, Wise was in privity with it or the plaintiff class, but rather rests its section 12(2) claim against the firm on the basis of the firm's alleged participation in the sale of the CitiSource stock. Because Blair seeks to rest liability not on privity, but on Holtzmann, Wise's participation in the sale, Blair's failure to sufficiently allege scienter is fatal to its section 12(2) claim. Blair's second cause of action is therefore dismissed, with leave to replead if Blair can allege sufficient facts and circumstances from which an inference of scienter can be drawn.

III. Contribution for alleged violations of the common law
Blair's fourth cause of action is for contribution for violations of the common *1084 law. Blair alleges that "[i]f members of the Plaintiff Class sustained damages in the manner alleged in the Consolidated Complaint for [sic] violations of the common law, such damages were caused, in whole or in part, by either the reckless or negligent acts and omissions of Holtzmann, Wise & Shepard...."
New York law provides that contribution is available among
persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, ... whether or not an action has been brought or a judgment has been rendered against the person from who contribution is sought.
N.Y.Civ.Prac.L. & R. § 1401 (McKinney 1976). As indicated in the commentary to the statute, contribution is available among
not only joint tortfeasors, but also concurrent tortfeasors, successive and independent tortfeasors, and alternative tortfeasors.... Indeed, ... nothing in the section requires that the liability of the defendants arise from tort. The liability may be contractual or may arise from a breach of warranty.... All that is required for contribution is that two people be held liable for the same [injury].
Id. comment C1401:3.
Of course, it is a sine qua non that a person be liable to the plaintiff on some basis before he can be held liable for contribution. Thus Blair's claim for contribution fails because it has alleged no basis of liability upon which Holtzmann, Wise could be held liable to the plaintiff class. Insofar as Blair means by "reckless act" to refer to the fraud alleged earlier in the complaint, that allegation is fatally deficient for lack of a sufficiently particular pleading of scienter, as discussed above. As to Blair's allegation of negligence, that claim is deficient because Blair fails to allege any of the elements of negligence. Most importantly, Blair fails to specify, either in its third-party complaint or its moving papers, any duty owed by Holtzmann, Wise to the plaintiff class.
For these reasons, Blair's fourth cause of action is dismissed, with leave to replead if Blair can sufficiently allege a basis upon which Holtzmann, Wise may be held liable to the plaintiff class.

IV. Negligent Misrepresentation
In its fifth cause of action, Blair alleges that Holtzmann, Wise was negligent in failing to discover that the two opinion letters which it supplied to Blair contained material misrepresentations and omissions. In its motion papers, Blair is emphatic that by this cause of action it does not seek contribution or indemnity, but rather damages upon an "independent" claim.
Fed.R.Civ.P. 14(a) provides that a defendant, as a third-party plaintiff, may implead any "person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff." In addition, Fed.R.Civ.P. 18(a) provides in pertinent part that once a party has impleaded a third-party defendant, he may join "as many claims, legal, equitable, or maritime," as he has against the third-party defendant. Since we have dismissed those claims which support Rule 14(a) impleader, the issue arises whether we should therefore dismiss the fifth cause of action joined pursuant to Rule 18(a).
The Supreme Court's language in United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) suggests that we should hesitate to retain jurisdiction over this claim, unless dismissal would have a substantial adverse effect on the third-party plaintiff. See Wright & Miller § 1444 at 236-237. Blair's strongest argument on this point is that dismissal would prejudice it by virtue of "potential statute of limitations problems." This unsupported speculation would appear insufficient to allow us to ignore the Supreme Court's directive, and we therefore dismiss Blair's fifth cause of action. Should Blair's fear prove founded, we are prepared to reconsider this decision.[23]

*1085 CONCLUSION
For the reasons discussed above, NYC's motion to dismiss the third-party complaint against it is granted as to the RICO claims and as to the claim for negligent supervision and control, but is otherwise denied. Blair is granted leave to replead its claim for negligent supervision and control. NYC's motion to sever and stay Blair's action against it is also denied, as is its motion for costs.
The third-party complaint against Holtzmann, Wise & Shepard is dismissed, with leave to replead.
SO ORDERED.
NOTES
[1] The New York City Parking Violations Bureau is an agency of New York City's Department of Transportation (the "DOT").
[2] The Consolidated Complaint alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO"), pursuant to 18 U.S.C. § 1962(c), against all of the other defendants, but not against Blair.
[3] According to the Consolidated Complaint, NYC insisted on these broad rights because of "severe doubts by City officials that [the computer] would be financially worthwhile to the City." Consolidated Complaint at ¶ 60.
[4] Rule 10b-5 provides that

It shall be unlawful for any person ....
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
(emphasis added)
[5] The definition of "person" set forth in section 3(a)(9) of the Exchange Act applies to Rule 10b-5 by operation of 17 C.F.R. § 240-01(b).
[6] Nor can the distinction urged by NYC be found in the language of section 10(b). The prohibitions of that statute are not limited to issuers, but extend to "any" person. E.g., Lloyd v. Industrial Bio-Test Laboratories, Inc., 454 F.Supp. 807, 811 (S.D.N.Y.1978).
[7] To put this case in context, we note that it was decided at a time when NYC was facing a serious threat of bankruptcy.
[8] Congress took pains to make explicit that it did not intend by the 1975 Amendments to regulate municipalities qua issuers. In Part III, section B of the Senate Report, entitled "Regulation of Municipal Securities ProfessionalsNot Issuers", the Senate specifically stated that it did not mean by the Amendments to subject municipal issuers to the registration and disclosure requirements of the Securities Act of 1933. Senate Report at 44. This point was reiterated in the Conference Report, which states that "[t]he exemption for issuers of municipal securities from the basic regulatory requirements of the Federal securities laws was continued." H.Conf.R.Rep. No. 94-229, 94th Cong., 1st Sess. 101, U.S.Code Cong. & Admin.News 1975, pp. 179, 332. Apparently, however, municipalities were not comforted by Congress' stated position, and expressed the fear that by requiring dealers to secure certain types of information from municipal issuers, and concurrently subjecting the municipalities to the antifraud provisions of the 1934 Act, Congress was thereby imposing a de facto registration requirement for municipal issues. See Senate Report at 44-45.
[9] The abuses with which the Senate was concerned included unconscionable markups, churning, and high-pressure sales techniques. Senate Report at 43.
[10] Our decision is not at odds with the decision of the Chief Judge of this District in In re Baldwin-United Corporation Litigation, No. M 21-35 (S.D.N.Y. June 27, 1986) (Brieant, C.J.) [available on WESTLAW, 1986 WL 358]. That case, which held that the 1975 Amendments were intended to impose section 10(b) liability on state governments only when they issued or otherwise participated in the sale of securities, is distinguishable from the case at bar. It was compelled by the sovereign immunity of states under the Eleventh Amendment, and it is well settled that the Eleventh Amendment is not a bar to municipal liability. E.g., Monell v. New York City Department of Social Services, 436 U.S. 658, 690 n. 54, 98 S.Ct. 2018, 2035 n. 54, 56 L.Ed.2d 611 (1978); Lincoln County v. Luning, 133 U.S. 529, 530, 10 S.Ct. 363, 363, 33 L.Ed. 766 (1890); County of Monroe v. Florida, 678 F.2d 1124, 1131 (2d Cir.1982), cert. denied, 459 U.S. 1104, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983).
[11] Data Conversion Corporation was owned and operated by Marvin and Albert Kaplan, Marvin Kushnick and Morton Karper. Sometime during 1979, it contracted with the PVB to provide keypunching and other services relating to the processing of parking tickets. NYC's interest in the hand-held computer of course presented the possibility that the need for these services would be eliminated.
[12] For cases discussing the showing required to establish the good faith defense, see, e.g., Marbury Management, Inc. v. Kohn, 629 F.2d 705, 716 (2d Cir.), cert. denied 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980); Paul F. Newton & Co. v. Texas, 630 F.2d 1111, 1120 (5th Cir.), reh'g denied, 634 F.2d 1355 (1980); Barthe v. Rizzo, 384 F.Supp. 1063, 1069-70 (S.D.N.Y. 1974); see also, Note, Liability of Corporate Directors as "Controlling Persons" Under Section 20(a) of the Securities Exchange Act, 28 Drake L.Rev. 437, 448-54 (1978-79).
[13] In support of its argument that the prior adjudication of the primary violator's liability is an element of a section 20(a) claim, NYC has cited Sanders v. John Nuveen & Co., 524 F.2d 1064, 1068 n. 5 (7th Cir.1975), vacated and remanded on other grounds, 425 U.S. 929, 96 S.Ct. 1659, 48 L.Ed.2d 172 (1976). Apparently, NYC has pounced upon this case because of language in the cited footnote indicating that the controlling persons could be held liable under section 20(a) "only if [the controlled person were] first found to be liable." This case is not helpful. In it, both the controlling and the controlled persons were named as defendants, so that adjudication of the controlled person's liability was certain to come about. Thus the issue of whether the controlled person's liability was an element of the plaintiff's case against the controlling persons was not before the court. Therefore, it seems that by the cited language, the court meant simply that the issue of the controlled person's liability would have to be decided before the issue of the controlling persons' liability could be determined.
[14] NYC's papers suggest that it believes that Blair is seeking contribution for injuries suffered by itself rather than injuries suffered by the plaintiff class. Of course by definition contribution is available to Blair, if at all, only for injuries sustained by the plaintiff class.
[15] NYC argues that since the only damages alleged by Blair consist of the liability it may face in the class action, plus the attorneys' fees it has had to expend in that and the third-party action, Blair is not only seeking contribution, but is in effect improperly seeking indemnification. NYC argues that Blair may not seek indemnification for any liability it may incur to the plaintiff class as a result of its own violations of the federal securities laws.

Both NYC and Blair agree that indemnification is unavailable for intentional or reckless violations of the federal securities laws. See Globus v. Law Research Service, Inc., 418 F.2d 1276, 1288-89 (2d Cir.1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). Thus Blair acknowledges that indemnification is unavailable to it for any liability it may have to the plaintiffs for violations of section 10(b) or Rule 10b-5 since a verdict against it based on such violations necessarily indicates a finding that it acted with actual knowledge or recklessness.
However, Blair argues, indemnification is available for merely negligent violations of the federal securities laws, and therefore it may seek indemnification for its liability in the event that it is found to have only negligently violated sections 11 or 12(2) of the 1933 Act. There is some support for Blair's position. See Adalman v. Baker, Watts, & Co., 599 F.Supp. 752 (D.Md. 1984), on other grounds aff'd in part and rev'd in part, 807 F.2d 359 (4th Cir.1986); see also Nelson v. Quimby Island Reclamation Dist., 491 F.Supp. 1364, 1381 (N.D.Cal.1980) (rejecting indemnity for intentional misconduct, but suggesting that its holding would have been different had liability been based on negligence); cf. In re Financial Partners Class Action Litigation, 597 F.Supp. 686, 688 (N.D.Ill.1984), cert. denied, ___ U.S. ___, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988) (denying dismissal of an indemnity claim against a defendant accused of having violated the Commodities Exchange Act, 15 U.S.C. § 713a-7 (1976)). The Adalman court justified its holding on the principle that an unsuccessful defendant should be able to obtain indemnity from one significantly more responsible for the injury to the plaintiff. Adalman, 599 F.Supp. at 754.
Those courts which have denied indemnification for even negligent violations reason that the purpose of the 1933 Act is regulatory, rather than compensatory, so that "`the question of who pays the damages to the plaintiffs is of as great concern as the issue of whether the plaintiffs are to be compensated at all.'" Odette v. Shearson, Hammill & Co., 394 F.Supp. 946, 957 (S.D.N.Y.1975) (Carter, J.) (citations omitted). These courts have found that indemnification would undermine the deterrent policy of the securities laws and that only the spectre of sure liability will encourage the exercise of due diligence and reasonable care. Id.; see also Globus, 418 F.2d at 1288 (resting its denial of indemnity on the fact that the underwriter had actual knowledge, but noting that "[u]nderwriters who knew they could be indemnified simply by showing that [another] was `more liable' than they ... would have a tendency to be lax in their independent investigations"); Laventhol, Krekstein, Horwath & Horwath v. Horwitch, 637 F.2d 672, 676 (9th Cir.1980), cert. denied, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981); In re Olympia Brewing Co. Securities Litigation, 674 F.Supp. 597, 610-614 (N.D.Ill. 1987) (denying indemnity on grounds of both policy and lack of judicial authority); 2 A. Bromberg & L. Lowenfels, Securities Fraud & Commodities Fraud, § 5.7(277) at 5:82.82 (1983).
We need not decide this issue at this time.
[16] This result does not allow a culpable entity to escape all liability under RICO. Where an entity is alleged to have been an active perpetrator, and not merely a passive instrument of the racketeering activity, it may face liability under § 1962(a). E.g., Haroco, 747 F.2d at 401-402; contra, Rush, 628 F.Supp. at 1196-1198.
[17] This analysis holds even though the entity is alleged to have been an active perpetrator, and not a passive instrument of the racketeering activity. Schofield, 793 F.2d at 32 n. 3.
[18] Blair notes that although a single entity cannot simultaneously constitute both the RICO person and the entire RICO enterprise, an entity can be liable as the RICO person and be one of a number of members of the RICO enterprise. See Cullen v. Margiotta, 811 F.2d 698 (2d Cir.), cert. denied, ___ U.S. ___, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). Therefore, Blair suggests that it has stated a cause of action under RICO since it has alleged not only an enterprise consisting of solely the PVB, but also an enterprise consisting of an association in fact among the PVB and its employees. "[I]t is not obvious that [the problem presented by an entity's being alleged to have been both the RICO person and the RICO enterprise] can be resolved by merely alleging that the corporation and its employees constitute an association in fact", Haroco, 747 F.2d at 401, but in any event Blair's argument presents an issue which we need not decide, in light of the discussion below.
[19] Blair suggests that by virtue of its position as the agent of an entity with whom NYC contracted, it had such a special relationship. Blair cites no authority in support of its proposition, nor any explanation of how its position as the agent of a contracting entity establishes a special relationship vis-a-vis NYC's duty to prevent corruption.
[20] The parties' use of the term "special counsel" is apparently meant to indicate that Holtzmann, Wise was not the general counsel of CitiSource or its principals. At oral argument, it was indicated that legal services of the sort ordinarily performed by general counsel were provided to CitiSource by an unidentified firm in Mineola, New York, and by Stanley Friedman.
[21] The third-party complaint against Holtzmann, Wise also named as David Berdon & Co. as an additional third-party defendant. David Berdon & Co., a certified public accounting firm, acted as independent public accountants for Citisource in connection with the public offering. As such, it certified the financial statements of Citisource contained in the registration statement and prospectus which were used to sell the stock to Blair and the public. On October 26, 1987, Blair's claims against the firm were voluntarily dismissed without prejudice pursuant to a Stipulation and Order of Partial Dismissal.
[22] Section 12(2) provides in part:

Any person who ... offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances in which they were made not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him....
[23] Our decision to dismiss Blair's claim for negligent misrepresentation rests on jurisdictional grounds, and we therefore voice no opinion as to its merits.